# NO. 15-2061

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

## MOTOROLA MOBILITY LLC, GOOGLE INC.,

**Appellants**

v.

## MICROSOFT CORP.,

**Appellee**

## CORRECTED
## BRIEF OF APPELLANTS

**Appeal from the U.S. Patent and Trademark Office,
Inter Partes Reexamination No. 95/002,267
PTAB No. 2015-001463**

Debra J. McComas
Andrew S. Ehmke
Michael S. Parsons
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas  75219
Telephone: 214.651.5375
Facsimile: 214.200.0525
Debbie.McComas@haynesboone.com
Andy.Ehmke@haynesboone.com
Michael.Parsons@haynesboone.com

**Attorneys For Appellants,
Motorola Mobility LLC and Google Inc.**

## CERTIFICATE OF INTEREST – MOTOROLA MOBILITY LLC

Pursuant to Federal Circuit Rules 21(a)(2) and 47.4(a)(1), counsel for the

Appellant Motorola Mobility LLC certifies the following:

1.      The full name of every party or amicus represented by me is:

     Motorola Mobility LLC and Google Inc.

2.      The name of the real party in interest (If the party named in the

caption is not the real party in interest) represented by me is:

     None.

3.      All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party or amicus curiae represented by me are:

     Motorola Mobility LLC is, indirectly, a wholly-owned subsidiary of
Lenovo Group Limited; accordingly, Lenovo Group Limited has more
than 10% ownership of Motorola Mobility LLC.

4.      The names of all law firms and the partners or associates that

appeared for the party or amicus now represented by me in the trial court or agency

or are expected to appear in this court are:

     Haynes and Boone, LLP
     Debra J. McComas
     Andrew S. Ehmke
     Michael S. Parsons

Dated this 7th day of December, 2015.

                               */s/ Debra J. McComas*
                               Debra J. McComas

## CERTIFICATE OF INTEREST – GOOGLE INC.

Pursuant to Federal Circuit Rules 21(a)(2) and 47.4(a)(1), counsel for the Appellant Google Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:

      Motorola Mobility LLC and Google Inc.

2.      The name of the real party in interest (If the party named in the caption is not the real party in interest) represented by me is:

      None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      Google Inc. is a wholly-owned subsidiary of Alphabet Inc., a publicly-traded company (NASDAQ: GOOG, GOOGL). No publicly-held company owns 10% or more of Alphabet Inc.'s stock.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Haynes and Boone, LLP
Debra J. McComas
Andrew S. Ehmke
Michael S. Parsons

Dated this 7th day of December, 2015.

                         */s/ Debra J. McComas*
                         Debra J. McComas

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST – MOTOROLA MOBILITY LLC ...................... i

CERTIFICATE OF INTEREST – GOOGLE INC. ................................................. ii

TABLE OF CONTENTS ................................................................................ iii

TABLE OF AUTHORITIES ............................................................................ v

STATEMENT OF RELATED CASES ................................................................ 1

JURISDICTIONAL STATEMENT ................................................................... 2

STATEMENT OF THE ISSUES ...................................................................... 3

STATEMENT OF THE CASE ......................................................................... 4

STATEMENT OF THE FACTS ....................................................................... 6

    A.    The Narrow Invention Claimed By the '780 Patent ........................... 6

    B.    Claims 40-42 are directed to the common technology of an information processing device with a browser ............................... 8

        1.    "Hypermedia Browser" .............................................................. 9

        2.    "Content-loading mode" v. "Content-loaded mode" .................................................................................... 9

    C.    The prior art PenPoint Operating System discloses the invention claimed by claims 40-42 of the '780 patent ...................... 12

    D.    The Reexamination Proceeding ....................................................... 15

        1.    The Examiner initially finds all 42 claims obvious, but inexplicably reverses itself on claims 40-42 ...................... 16

        2.    The Board affirms the Examiner. ............................................ 17

SUMMARY OF THE ARGUMENT ................................................................. 21

ARGUMENT ............................................................................................. 24

I.    Standard of Review ....................................................................... 24

II.  The Board's construction improperly inserts limitations into claim 40...............................................................................25

    A.  The Board must apply the broadest reasonable construction of the claim term, giving effect to all terms. ..................25

    B.  The Board improperly inserted a requirement that certain content be withheld and *not* be displayed while in "content-*loading* mode." ...................................................26

III.  The Board's construction is not supported by the specification and excludes the only described embodiment. ...............................................29

IV.  Under a proper construction, the PenPoint prior art, which teaches "displaying such content . . . as it loads," renders claims 40-42 obvious. ...............................................34

V.  Claims 41-42 are unpatentable because claim 40 is unpatentable. ...............................................36

CONCLUSION AND PRAYER ...............................................37

ECF CERTIFICATION ...............................................38

CERTIFICATE OF COMPLIANCE...............................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABT Sys., LLC v. Emerson Elec. Co.*,
  797 F.3d 1350 (Fed. Cir. 2015) ................................................................34, 36

*In re American Academy of Science Tech Ctr.*,
  367 F.3d 1359 (Fed. Cir. 2004) ........................................................................25

*American Piledriving Equip., Inc. v. Geoquip, Inc.*,
  637 F.3d 1324 (Fed. Cir. 2011) ........................................................................25

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
  234 F.3d 14 (Fed. Cir. 2000) ......................................................................26, 28

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004) ....................................................................30, 33

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966) ..............................................................................................25

*Leo Pharm. Products, Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013) ..................................................................26, 28

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ..........................................................................30

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) ..................................................................24, 25

*In re Papst Licensing Digital Camera Patent Litig.*,
  778 F.3d 1255 (Fed. Cir. 2015) ........................................................................33

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ..................................................................29, 30

*Power Integrations, Inc. v. Lee*,
  797 F.3d 1318 (Fed. Cir. 2015) ........................................................................24

*In re Suitco Surface, Inc.*,
   603 F.3d 1255 (Fed. Cir. 2010) ...........................................................26

*Tempo Lighting, Inc. v. Tivoli*,
   742 F.3d 973 (Fed. Cir. 2014) .............................................................24

*Texas Digital Sys, Inc. v. Telegenix, Inc.*,
   308 F.3d 1193 (Fed. Cir. 2002) ...........................................................25

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) .............................................................30

**Statutes and Rules**

28 U.S.C. § 1295(a)(4)(A) .........................................................................2

35 U.S.C. § 102(b) ...................................................................................12

35 U.S.C. § 134 ..........................................................................................2

35 U.S.C. § 302 ..........................................................................................2

FED. CIR. R. 47.5 .......................................................................................1

## STATEMENT OF RELATED CASES

This appeal arises from *inter partes* reexamination control no. 95/002,267, in which the Patent Trial and Appeal Board issued a final decision on appeal that claims 1-39 of United States Patent No. 6,339,780 (the '780 patent) are invalid and claims 40-42 are not invalid. No "appeal in or from the same [*inter partes* reexamination] was previously before this or any other appellate court." Fed. Cir. R. 47.5. However, the '780 patent was the subject of litigation in *Microsoft Corp. v. Motorola Mobility LLC*, No. 2:10-cv-01823-JLR, in the United States District Court for the Western District of Washington, which case has been recently dismissed.

## JURISDICTIONAL STATEMENT

This is an appeal from a final Decision on Appeal (the "Decision") by the Patent Trial and Appeal Board (the "Board") in an *inter partes* reexamination. The Decision was issued on June 17, 2015. The Board had jurisdiction to issue the final Decision pursuant to 35 U.S.C. §§ 134 and 302 *et seq.* Notice of appeal was timely filed on August 10, 2015. This Court has jurisdiction over this timely appeal from the final Decision pursuant to 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

This appeal arises from an *inter partes* reexamination of the '780 patent. The Examiner rejected claims 1-39 of the '780 patent and confirmed claims 40-42. On appeal to the Board, the Board affirmed the Examiner on all claims. This appeal is limited to the question of whether the Board erred in affirming the Examiner's confirmation of claims 40-42. More specifically, Appellants raise the following errors:

1.   Did the Board err in construing "content-loading mode" as excluding displaying all of the loaded content?

2.   Under a correct construction of the term "content-loading mode," are claims 40-42 obvious over the prior art?

## STATEMENT OF THE CASE

This appeal arises from an *inter partes* reexamination of U.S. Patent No. 6,339,780 (the "'780 patent"). A62. The Examiner rejected claims 1-39 of the '780 patent and confirmed claims 40-42. A3888-A3389. The Board affirmed the Examiner on all claims. A20-A21. Microsoft did not appeal the rejection of claims 1-39. This appeal relates solely to the claims 40-42.

The '780 patent relates to the field of hypermedia content browsers and the use of loading status icons to indicate the progress of loading content in such browsers. A27 (col. 2:46-50). At the time of the alleged invention of the '780 patent, hypermedia browsers and loading status icons were already known. A27 (col. 1:53-57, 2:2-12). The loading status icons were often stationary icons positioned outside the viewing area that became animated when content was loading. A27 (col. 2:2-12). The '780 patent identified a problem with this approach when applied to handheld computing devices with limited display areas— insufficient display space to implement the prior art animated status icons. A27 (col. 2:30-39). The solution of the '780 patent was to use a "temporary, animated graphic element [presented] in a corner of the content viewing area" to signify that the browser was in a "content-loading mode." A27 (col. 2:48-50); A30-A31 (col. 8:60-9:6).

Claims 40-42 are directed to an information processing device comprising a hypermedia browser that operates in "content-loading mode" and "content-loaded mode." A30-A31 (col. 8:60-9:6). A load status graphic element is used to distinguish between these modes. A30-A31 (col. 8:60-9:6). In content-loading mode the hypermedia browser loads content, displays such content "as it loads," and displays a load status graphic element over the content viewing area. A30-A31 (col. 8:66-9:6). In content-loaded mode, the hypermedia browser also displays loaded content but no "load status graphic element' is displayed. A30 (col. 8:60-65). The absence of the graphic element indicates that the browser is in content-loaded mode. A30 (col. 8:60-65).

The Board improperly construed "content-loading mode," specifically the meaning of "display[ing] such content . . . as it loads." The Board's construction excludes displaying all loaded content while in content-loading mode. Under this construction, claims 40-42 were found nonobvious over the prior art PenPoint operating system ("Penpoint"), which discloses removing a status icon after displaying all loaded content. But, the Board's construction is in conflict with the plain reading of the claims and the sole embodiment disclosed in the specification. Under the proper claim construction, though, claims 40-42 are indisputably obvious in light of PenPoint.

5

## STATEMENT OF THE FACTS

### A.    The Narrow Invention Claimed By the '780 Patent

The '780 patent issued on January 15, 2002, from U.S. Patent Application No. 08/851,877. A23. The application for the '780 patent was filed on May 6, 1997. A23. Notably, claims 40-42 were not a part of the original application. *See* A121-A124. Instead, claims 40-42 were added during prosecution more than two years after filing the original application. A201; A252. The first iteration of claim 40 was included in an amendment filed in June 2000. *See* A193; A201 (claim 30). The second iteration (that issued as claim 40) was included in an amendment filed in June 2001. *See* A252; A261 (claim 30).

The '780 patent does not purport to invent hypertext browsers, loading status icons, use of status icons to distinguish between loading/loaded modes, or how to render/display content in a browser. The Background section of the '780 patent admits as much, describing the basic features of these prior art browsers. *See* A27 (col. 1:20-23, 53-63). For example, browsers known at the time were "used to retrieve and render hypermedia content from the WWW [World Wide Web]." A27 (col. 1:23-26). The hypermedia content that these browsers rendered included "text, images, sounds, and actions" that a user could browse through "regardless of the presented order of the topics." A27 (col. 1:12-15). The content displayed by

6

these browsers was not limited to the World Wide Web but also included different pieces of informational content like encyclopedia programs. A27 (col. 1:45-48).

The alleged invention of the '780 patent is directed to the narrow feature of a "load status" graphic icon in a browser that is displayed in the content viewing area *while* the browser is in a content-loading mode. A23. Such graphic icons were nothing new in 1997. *See, e.g.*, A27 (col. 1:20-23, 53-63). The prior art browsers also displayed status indicators to notify the user that the browser was loading documents or other multimedia content. A27 (col. 2:2-4). The status indicators took different forms, like flags, globes, or clocks, and functioned slightly differently (usually becoming animated while content is loading), but they all served the same purpose of notifying a user when content is being loaded. A27 (col. 2:5-7.) For example, the Microsoft Internet Explorer described in the Background of the '780 patent used "a flag that is normally stationary but that flutters or waves during content loading." A27 (col. 2:7-9).

Claims 40-42 recite the '780 patent's narrow improvement on the prior art, namely the lack of permanence of the loading status icon. Where prior art browsers animated a permanent and stationary icon to signify that the browser is loading content, A27 (col. 2:2-12), claims 40-42 purport to invent showing an icon only while in a content-loading mode. A28 (col. 4:56-63).

7

**B.    Claims 40-42 are directed to the common technology of an information processing device with a browser.**

Claims 40-42 are directed to an information processing device with a "hypermedia" browser. A30 (col. 8:51). Claim 40 is an independent claim. Claims 41-42 depend on claim 40. A31.

Specifically, claim 40, reproduced below, recites the functionality of showing and hiding the load status graphic element as two distinct modes of operation—"content-loading mode" and "content-loaded mode:"

40. An information processing device comprising:

a processor;

a display;

a hypermedia browser executing on the processor to load and display content in a content viewing area on the display;

wherein the hypermedia browser is configured to operate in a content-loading mode and a content-loaded mode;

in the content-loaded mode, the hypermedia browser displays loaded content in the content viewing area and no "load status" graphic element is displayed, wherein absence of such "load status" graphic element indicates that the browser is in the content-loaded mode;

in the content-loading mode, the hypermedia browser loads content, displays such content in the content viewing area as it loads, and displays a

"load status" graphic element over the content view area obstructing part of the content displayed in the content viewing area, wherein presence of such "load status" graphic element indicates that the browser is in the content loading mode; and

wherein content comprises data for presentation which is from a source external to the browser.

A30 (col. 8:51-9:8).

### 1. "Hypermedia Browser"

According to the '780 patent, a "hypermedia" browser is a computer "program that is capable of displaying or otherwise rendering hypermedia content and of loading additional or alternative hypermedia content in response to a user's selection of hyperlinks." A28 (col. 4:4-8). In other words, a "hypermedia" browser is just a browser for viewing documents or Internet content.

### 2. "Content-loading mode" v. "Content-loaded mode"

In claim 40, "content-loading mode" requires three operations—(1) loading content, (2) displaying such content as it loads, and (3) displaying a load status graphic element. "Content-loaded mode" requires two operations—(1) displaying loaded content and (2) not displaying the load status graphic element.

The specification describes these two modes in Fig. 3 and Fig. 4 of the '780 patent, reproduced below, where Fig 3 represents the "content-loading mode" and Fig. 4 represents the "content-loaded mode." *See* A28 (col. 4:50-63).



*Fig. 3*

A25 (Fig. 3 (annotated)).



*Fig. 4*

A26 (Fig. 4 (annotated)).

As seen in Fig. 3 and Fig. 4, **both** modes <u>display all loaded content in the content viewing area</u>. A25-26. The only difference between the content-loading mode (i.e., Fig. 3) and the content-loaded mode (i.e., Fig. 4) is the presence or absence of the load status graphic element. A28 (col. 4:50-63). The specification describes no other differences between Fig. 3 and Fig. 4. *See* A27-29. Nor does the specification provide a definition for "display such content as it loads" or describe any other embodiments or modes of operation for "display such content as it loads" beyond those shown in Fig. 3 and Fig. 4. *See* A27-29.

11

**C.    The prior art PenPoint Operating System discloses the invention claimed by claims 40-42 of the '780 patent.**

In addition to the prior art web browsers expressly disclosed in the '780 patent, as early as 1992 another system, the PenPoint operating system was described in two publications—PenPoint UI Design Guidelines ("PenPoint Guidelines") and PenPoint Architectural Reference ("PenPoint Reference"). A387; A575. Both references describe aspects of the PenPoint operating system and designing applications for the PenPoint operating system. *See* A387; A575. Both references were published as early as 1992 and are prior art to the '780 patent under 35 U.S.C. § 102(b). *See* A379; A574. Thus, the disclosure in PenPoint was well known and within the knowledge of a person of ordinary skill in the art five years before '780 patent was filed.

PenPoint discloses a browser that loads and displays hypermedia content. PenPoint's browser is in the form of a Notebook application shown below:



**Figure 96: Basic Document Layout**

A553. The Notebook application includes many features known to exist in prior art browsers such as a content viewing area (i.e., PenPoint's work area) and browser controls (i.e., PenPoint's menus). A554.

PenPoint's browser was also capable of displaying various types of hypermedia content. For example, Figure 4 of the PenPoint Guidelines shows the type of hypermedia content displayed in the Notebook application, which includes text and hyperlinks:

13



Figure 4: Half-Outlined Buttons in Text

A410 (annotated). Thus, PenPoint describes a browser that displayed hypermedia content in a content viewing area.

Further, PenPoint's browser needed to notify users when a time-consuming task was being performed, such as retrieving files over a network (i.e., loading content). In fact, the PenPoint Reference states that: "Occasionally your application might need to perform some time-consuming work—time-consuming enough for the user to notice that the machine is not responding. Such work might include performing computer-intensive work or copying large files across a network." A762.

To address this need to notify users of time-consuming tasks, PenPoint teaches the same notification method as recited in claims 40-42 of displaying an icon (e.g., "busy clock") when loading content and removing the icon when loading completes. A762. ("To assure the user that the computer is still working, you can put up a busy clock, a small animated image of a clock face, on the

14

screen."). The icon could be placed anywhere on the display, but PenPoint particularly teaches that it should be placed in relation to user interaction. For example, Figure 47 of the PenPoint Guidelines instructs that the icon is positioned in relation to the user selecting a button:



When the operation is invoked from a button, center the busy clock just above the button, as shown in Figure 47.

**Busy Clock Icon**

**Figure 47: Busy Clock Above Button**

This eliminates the visual interference caused if the clock is centered on the pen-down point of the tap, partially overlapping the icon or button.

A452 (annotated). Accordingly, when the icon was used in connection with hyperlinks in the browser's content viewing area, the icon could be displayed over the hyperlink while the content loaded. Thus, PenPoint renders obvious notifying a user that a browser is busy loading content by displaying a graphic element as recited in claim 40.

### D.    The Reexamination Proceeding

On September 14, 2012, the Appellants filed a Request for Reexamination ("the Request") of the '780 patent. *See* A62-A90. The proceeding was assigned

Reexamination No. 95/002,267, and was ordered by the Office on December 11, 2012. A1727-A1730.

### 1. The Examiner initially finds all 42 claims obvious, but inexplicably reverses itself on claims 40-42.

In the Office Action that issued with the Order Granting the Request, the Examiner initially found claims 1-42 obvious over PenPoint (i.e., the PenPoint UI Guidelines in view of the PenPoint Architectural Reference) and adopted the reasoning provided in the Request. A1736. The Examiner also found a subset of the claims obvious over a combination of other references that are not the subject of the present appeal. A1738; A1743.

In Patent Owner's Response filed on February 11, 2013, Patent Owner made a number of arguments directed to the Examiner's rejection of claim 40. A1817. In particular, Patent Owner argued that PenPoint fails to teach that "content is displayed as it loads." A1817. This argument appeared in a three-line paragraph with no analysis or other support that establishes what displayed "as it loads"—as part of the "content-loading mode"—means. *See* A1817. Contrarily, Requester argued that PenPoint does in fact teach displaying content "as it loads" as part of the "content-loading mode" since the limitation, when properly construed, includes displaying <u>all</u> of the loaded content. A3739.

In the Action Closing Prosecution, issued on July 31, 2013, the Examiner adopted Patent Owner's argument and reversed the rejection of claims 40-42.

A3788-89. Despite the express claim language and the teachings in the specification, the Examiner construed claim 40 to exclude the situation where all of the loaded content is displayed while in "content-loading mode." A3788. This was the Examiner's sole basis for confirming claim 40, and since claims 41 and 42 depend from claim 40, these claims were confirmed as well. *See* A3788-A3789.

In the Right of Appeal Notice ("RAN") issued on February 26, 2014, the Examiner restated Requesters' position that "displaying content 'as it loads' can include displaying any portion of received content up to and including all of the received content" (i.e., all loaded content). A3882. The Examiner then expressly rejected this position stating that: "Interpreting 'as it loads' broadly enough to include *after it has finished loading* would be unreasonable in light of the explicit recitation of two modes of operation in claim 40, i.e., a content-loading mode (which displays content as it loads) and a content-loaded mode (which displays loaded content)." A3882 (emphasis original).

## 2.    The Board affirms the Examiner.

Requesters appealed the confirmation of claims 40-42 to the Board and maintained the argument that the Examiner's construction was overly narrow in light of the express limitations recited in the claims and the disclosure in the specification. Specifically, Requesters argued that the Examiner's construction was overly narrow for two reasons—(1) the express language of claim 40 encompasses

displaying all of the loaded content in content-loading mode and (2) Fig. 3, which is the only representation of content-loading mode in the specification, explicitly shows displaying all of the loaded content. A5012-A5015.

Patent Owner, on the other hand, simply argued that the Examiner's position was correct without adding anything more than what the Examiner offered in the RAN. A5209-A5210. In fact, Patent Owner's argument to the Board in this regard is primarily a cut-and-paste of the Examiner's reasoning from the RAN. *See* A5209-A5210. Patent Owner also argued that "Fig. 3 is merely a static view of a dynamic process, i.e., a process that is changing in the sense that content is being loaded and partially rendered or displayed until the content is fully rendered by the browser . . . ." *See* A5212. But nothing provided by the Patent Owner in support of this statement actually shows Fig. 3 representing something more than what is actually shown, i.e., displaying all of the loaded content. *See* A5210-A5212. Patent Owner cited no evidence whatsoever that the claim language of claim 40, in view of Fig. 3 or the level of ordinary skill, recites "partially" rendering or "partially" displaying the content. *See* A5213-A5214. Nor did Patent Owner point to any language in the specification where the concept of "partially" rendering or "partially" displaying the content was actually disclosed in the specification. *See* A5213-A5214. No such language exists in the specification.

Despite the lack of support from the Patent Owner on its position, the Board issued its Final Written Decision on June 17, 2015, affirming the Examiner on all claims and finding claims 1-39 obvious over PenPoint, while finding claims 40-42 patentable over PenPoint. A20.

With regard to claims 40-42, the Board agreed with the Appellants that claim 40 requires two modes of operation. A6. The Board also agreed with the Appellants as to the particular operations that are required in each mode. A6 ("The first mode is a content-*loaded* mode where a browser displays *loaded* content in a content viewing area, but does not display a 'load status' graphic element. The second mode is a content-*loading* mode where the browser (1) loads content; (2) displays such content in the viewing area *as it loads*, and (3) displays the graphic element over the area obstructing part of the displayed content."). But despite the Board correctly acknowledging the operations required by each mode, the Board still affirmed the Examiner's confirmation based solely on the supposed meaning of term "display such content . . . as it loads." A8.

According to the Board, PenPoint does not render claim 40 obvious because the content in PenPoint "is not displayed *as* it loads, but rather *after* it loads." A8 (emphasis original). The Board reasoned that: "To construe the content-*loading* mode to include displaying *all loaded* content (i.e., after it loads completely) as Requester suggests would conflate the distinct temporal aspects of the two recited

modes, namely displaying content during and after loading, respectively." A8-A9 (emphasis original). As discussed below, this is incorrect because it ignores the requirement of the claim that the content is loaded and then <u>such</u> content is displayed, *all while still in the "content-loading mode."*

## SUMMARY OF THE ARGUMENT

Claims 40-42 of the '780 patent recite nothing more than a method of notifying a user that a browser is in a content-loading mode. For doing this, claim 40 recites a device that operates in two modes that are distinguished by the appearance of a graphic element. In the "content-loading mode," the browser "loads content," "displays such content . . . as it loads," and displays a loading status graphic. In the "content-loaded mode," the browser "displays loaded content," but does not display a loading status graphic. The Board erred in construing claim 40 and then applied the erroneous construction to the PenPoint prior art.

The Board erred in construing claim 40 in two ways. First, the Board's construction is inconsistent with the claim language and improperly narrows the scope of the claims. Claim 40's recited "content-loading mode" includes the operations of loading content and "display[ing] such content . . . as it loads." Therefore, content is both loaded and displayed while in "content-loading mode." This claim does not include a limitation that some of this loaded content is withheld from "content-loading mode" and only displayed during the "content-loaded mode." The Board's construction improperly inserts such a limitation by excluding the display of <u>all</u> such loaded content during the "content-loading mode."

Second, the Board's construction excludes the only embodiment disclosed in the '780 patent. The '780 patent uses two figures—Fig. 3 and Fig. 4—to illustrate the only embodiment disclosed in the specification. Fig. 4 represents "content-*loaded* mode" and shows the browser displaying <u>all</u> loaded content. Fig. 3 represents "content-*loading* mode" and shows the browser displaying the **same** loaded content as Fig. 4. When comparing Fig. 3 and Fig. 4, it is apparent that *all loaded* content is displayed in **both** "content-*loading* mode" and "content-*loaded* mode." Even though Fig. 3 and Fig. 4 show that all loaded content is displayed while still in the "content-loading mode," the Board nevertheless construed claim 40 such that it does not encompass displaying all loaded content during the "content-loading mode." Thus, the Board's construction excludes the only disclosed embodiment.

Since the Board's construction inserts a claim limitation where none exists and excludes the only disclosed embodiment, the Board's construction is not the broadest reasonable construction. Thus, the Board should be reversed and the proper construction—where "display such content . . . as it loads" encompasses displaying all loaded content—should be adopted.

Once the proper construction of claim 40 is adopted, claim 40 is rendered obvious in view of PenPoint. PenPoint teaches a browser that loads content over a network and displays such content, and PenPoint further teaches using an icon to

notify a user that a browser is loading content which disappears when the device completes the loading operation. Consequently, once the proper construction of claim 40 is adopted, claim 40 should be found obvious over PenPoint.

Moreover, since claims 41 and 42 were found to be patentable only because of their dependency from claim 40, claims 41 and 42 should be found unpatentable for the same reasons.

# ARGUMENT

## I.    Standard of Review

This is an appeal from the Board's final Decision in an *inter partes* reexamination, specifically challenging the Board's erroneous claim construction and the impact of that error on the Board's failure to find claims 40-42 unpatentable.

In reexamination, the Board "applies a different claim construction standard than that applied by a district court, affording claims 'their broadest reasonable interpretation consistent with the specification.'" *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015) (quoting *In re NTP, Inc.*, 654 F.3d 1279, 1287 (Fed. Cir. 2011)). On appeal, this Court reviews the Board's underlying factual determinations related to any extrinsic evidence for substantial evidence and the ultimate construction of the claim *de novo*. *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1297 (Fed. Cir. 2015). Because the intrinsic evidence dictates the proper claim construction in this case, this Court's review is entirely *de novo*. *Id.*

The Board's improper claim construction led it to find claims 40-42 non-obvious. Obviousness is a question of law based on underlying fact findings. *Tempo Lighting, Inc. v. Tivoli*, 742 F.3d 973, 977 (Fed. Cir. 2014) (citing *In re NTP, Inc.*, 654 F.3d 1279, 1291 (Fed. Cir. 2011)). These fact findings include the

scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the field of the invention, and any relevant objective considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). Applying the proper claim construction, this Court should conclude the claims obvious as a matter of law.

## II.    The Board's construction improperly inserts limitations into claim 40.

### A.    The Board must apply the broadest reasonable construction of the claim term, giving effect to all terms.

In cases such as this, claims appealed from the Board receive the broadest reasonable meaning in light of the specification" and claim language as a whole. *In re American Academy of Science Tech Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004). That is not to say, however, that the Board is free to give the claims any construction it desires, no matter how reasonable. *Microsoft*, 789 F.3d at 1298. It is improper to import limitations from the specification or extrinsic evidence into the claims. *American Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331-32 (Fed. Cir. 2011) (noting that the role in construing claims is "not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence."); *Texas Digital Sys, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204-1205 (Fed. Cir. 2002). Instead, claim

constructions should be consistent with both the claims and the specification. *See, e.g.*, *Leo Pharm. Products, Ltd. v. Rea*, 726 F.3d 1346, 1352 (Fed. Cir. 2013). Moreover, claim construction should also be consistent with the purpose of the invention defined in the specification. *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000). But because the Board improperly imported limitations into the claims, the Board's claim construction is not the broadest reasonable construction and should be reversed. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259-60 (Fed. Cir. 2010).

**B.    The Board improperly inserted a requirement that certain content be withheld and *not* be displayed while in "content-*loading* mode."**

Claim 40 recites a browser that loads and displays content in two operating modes—"content-loading mode" and "content-loaded mode." A30-A31. In "content-*loading* mode," the browser performs three specific operations:

> (1) "loads content,"
>
> (2) "displays such content . . . as it loads," and
>
> (3) "display[] a 'load status' graphic element" that "indicates that the browser is in the content-loading mode."

A30-A31 (col. 8:66-9:6).

In "content-*loaded* mode," the browser performs two specific operations:

> (1) "displays loaded content" and

26

(2) not display a "load status" graphic element.

A30 (col. 8:60-65). The Board agreed with these requirements for each mode. A5.

The plain language of claim 40 recites that the "content-*loading* mode" loads the content <u>and</u> displays such content as it loads. The claim, however, does not require that certain content be withheld and *not* be displayed while in "content-*loading* mode." In fact, the claim defines "content-*loading* mode" such that the content is loaded <u>and displayed</u> *while still in content-loading mode*. A30-A31 (col. 8:66-9:6). Put simply, the plain language of claim 40 recites that the "content-loading mode" encompasses both loading the content and displaying <u>such</u> content.

The specification of the '780 patent, particularly Fig. 3 and Fig. 4, supports this claim construction. Fig. 4, which represents content-loaded mode, displays the content (while not displaying an icon indicating that the browser is in content-loading mode). Looking then to Fig. 3, which represents content-loading mode, the same content is likewise displayed (as well as the icon indicating that the browser is in content-loading mode). Accordingly, Fig. 3 discloses an embodiment in which "the content" is loaded and displayed while in "content-loading mode." Moreover, Fig. 3, when viewed in conjunction with Fig. 4, shows that all of the loaded content is likewise displayed while still in the content-loading mode. Thus, Appellant's proposed construction that the "content-loading mode" encompasses displaying all of the loaded content while still in content-loading mode is supported by both the

27

claim language and the specification. *See, e.g.*, *Leo Pharm. Products, Ltd. v. Rea*, 726 F.3d 1346, 1352 (Fed. Cir. 2013) (finding that the Board erred by narrowing the definition of "storage stable" to something far short of its broadest reasonable meaning).

Appellant's proposed construction is also reasonable in light of the general purpose behind a loading status icon, which is to indicate to the user of the browser when the browser is active or inactive. *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) (reversing claim construction found inconsistent with stated purpose of the invention). It is reasonable, in light of this general purpose that the browser would wait until all content was loaded and displayed before it removed the loading status icon. This ensures that the user is not met with the situation where the icon indicates that the browser activity is complete, but where the display contained only some of the displayed content.

Despite the claim language, the specification, and the purpose of the loading status icon, the Board limited the claim to exclude displaying all loaded content during "content-loading mode." The Board's construction is not based on express claim language or the specification. Instead, the Board read into the claim a strict temporal distinction between the two recited modes—a temporal distinction that is not required by the claims or described in the specification. The Board stated: "To construe the content-loading mode to include displaying *all loaded* content (i.e.,

after it loads completely) as Requester suggests would conflate the distinct temporal aspects of the two recited modes, namely displaying content during and after loading, respectively." A8-A9 (emphasis original). This claim limitation is improper.

The Board's temporal distinction leads to inconsistency within the claim. Under the Board's construction—where the content-loading mode does not include displaying all loaded content—the content-loading mode would load some content, but not display such content. This conflicts squarely with the requirement that within "content-loading mode" the content is displayed "as it loads." A browser cannot simultaneously display content during content-loading mode and withhold that content from display until switching to "content-loaded mode."

For the foregoing reasons, this Court should reverse the Board's construction and find that "displays such content . . . as it loads" in the "content-loading mode" encompasses displaying <u>all</u> of the loaded content.

## III.    The Board's construction is not supported by the specification and excludes the only described embodiment.

The Board's construction not only ignores the express language of the claims, it also improperly excludes the only embodiment described in the specification. As this Court has emphasized, the "claims do not stand alone." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). Rather, the specification and any preferred embodiment play a critical, often dispositive, role

in claim construction. *Id.* Thus, while claims are not limited to the preferred embodiment, a construction that excludes a preferred embodiment should ordinarily stand rejected. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004); *see Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Because the Board's construction would exclude the preferred embodiment, it should be rejected.

The embodiment disclosed in the '780 patent is shown in Fig. 3 and Fig. 4. Fig. 3 represents "content-loading mode" because "the browser is configured to display a temporary graphic element 64 . . . during times when the browser is loading content." A28 (col. 4:53-56). Fig. 4 represents "content-loaded mode," because the display shows content that has been loaded "during a period when no additional content is being loaded." A28 (col. 4:60-63). In Fig. 4, graphic element 64 is removed "because the page has been completely loaded." A28 (col. 4:60-63). Upon closer inspection, the only difference between Fig. 3 and Fig. 4 is the presence of graphic element 64 in Fig. 3. Otherwise, Fig. 3 ("content-loading mode") and Fig. 4 ("content-loaded mode") each display the exact same content, just as is contemplated in claim 40.



**Fig. 3**

A25 (Fig. 3 (annotated)).



**Fig. 4**

A26 (Fig. 4 (annotated)).

The Board, however, ignored what is plainly shown in Fig. 3 and Fig. 4 and instead relied on Patent Owner's unsupported statement that: "Figure 3 is a static view of a dynamic process and, therefore, can be a snapshot of the content as it is loaded." A9. Moreover, the Board basically added description to the specification when it stated that:

> [E]ven images that are visibly similar, such as those in Figures 3 and 4 of the '780 patent, can have different content. For example, displayed images that appear identical may have different resolutions, or include invisible elements that are displayable once they are loaded (e.g., graphic elements with the same foreground and background color, watermarks, etc.). In these examples, the displayed content would differ during and after loading, yet appear visibly similar.

A9. But no mention is made in the specification that Fig. 3 is a dynamic process or that there are different resolutions or invisible elements that are displayed **_only_** during the content-*loaded* mode. In fact, the Board provided no citation to the record to support these conclusions.

The Board's reasoning also ignores the claim language of claim 40. In claim 40, the loading of content (e.g., different resolutions or invisible elements) happens during "content-*loading* mode." And, claim 40 requires that <u>such content is also displayed</u> during "content-loading mode." To the extent that there are different resolutions or invisible elements that are displayable once they are loaded, then, in accordance with the express language of claim 40, these different resolutions and

invisible elements are content loaded during "content-loading mode," and then such content is displayed while still in the same "content-loading mode."

The Board's analysis and claim construction exclude the plain teaching of Fig. 3 and Fig. 4, which reflect the only embodiment disclosed in the specification of the '780 patent. Just as established by this Court in *C.R. Bard*, a construction that excludes the preferred embodiment is rarely, if ever, correct. *C.R. Bard*, 388 F.3d at 865; *see In re Papst Licensing Digital Camera Patent Litig.*, 778 F.3d 1255, 1270-71 (Fed. Cir. 2015) (rejecting claim construction that would exclude preferred embodiment).

The Board's construction here is not correct because it excludes not only the preferred embodiment, but the only embodiment. The only embodiment described in the '780 patent clearly shows that all loaded content is displayed while the browser is in "content-loading mode" (as shown in Fig. 3) and the proper construction should include that embodiment. *See id.*

Because the Board's construction does not give effect to each claim term and excludes the only embodiment described in the specification, the Board should be reversed and the proper construction where "displays such content" encompasses displaying all of the loaded content should be adopted.

**IV.    Under a proper construction, the PenPoint prior art, which teaches "displaying such content . . . as it loads," renders claims 40-42 obvious.**

As discussed above, the broadest reasonable interpretation of "displays such content . . . as it loads" includes loading and then displaying all of the content while in "content-loading mode" (e.g., while displaying an icon indicating a content-loading mode). Under this proper construction, claim 40 is obvious over PenPoint. Thus, the Board should be reversed and claim 40 should be found unpatentable as obvious over PenPoint. *See ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1357 (Fed. Cir. 2015) (finding obviousness as a matter of law on appeal).

In its Decision, the Board found that PenPoint teaches all of the limitations of claim 40 except for "displays such content . . . as it loads." A6-A8. In fact, the Board did not decide whether PenPoint teaches this limitation under the proper construction proposed by the Appellants. A8-A9. Instead, the Board decided the issue based on an improper construction that, for the reasons discussed above, should be reversed. A8-A9. Applying the proper construction, however, there is no dispute that claims 40-42 are obvious in light of PenPoint.

With regard to claim 40's content-loading mode and specifically "displays such content . . . as it loads," PenPoint teaches loading and displaying all such loaded content while a "load status" graphic element (e.g., the busy clock) appears on the display. Specifically, PenPoint teaches the browser can perform a time-

consuming operation when loading content from an external source: "Occasionally your application might need to perform some time-consuming work—time-consuming enough for the user to notice that the machine is not responding. Such work might include performing computer-intensive work or copying large files across a network." A762. To notify the user that the system is busy during these time-consuming load operations, PenPoint teaches that an icon (e.g., busy clock) is to be displayed each time the system is busy and until the result of a command appears:

## Busy Clock

It is very important that the user have some indication that the machine is alive if the result of a command doesn't appear instantly.

PenPoint provides a standard *busy clock* for this purpose. It is very important to use the busy clock consistently, because your user will be expecting it, since it is used throughout the PenPoint environment.

A451. The result of a command includes changing the display based on the user's input:

theBusyManager responds to the message, msgBusyDisplay. When your application starts some work that will not change the display for a number of seconds, send msgBusyDisplay to theBusyManager with busyOn (a U32) as the argument. When your application is no longer busy, send msgBusyDisplay to theBusyManager with busyOff (a U32) as the argument.

A762. Thus, in the case of loading content from an external source (a time-consuming process that shows the busy clock), PenPoint teaches that the icon

should be displayed until the application is no longer busy (e.g., until the content has been displayed to the user). A451; A762. Because PenPoint teaches that the icon will remain showing on the display while content is loaded from an external source and displayed, PenPoint teaches claim 40's limitation of "in content-loading mode . . . display[ing] such content in the content viewing area as it loads" when properly construed.

When claim 40 is properly construed, PenPoint renders obvious all of its limitations. Because the Board's construction of claim 40 is incorrect and because PenPoint teaches all of the limitations of claim 40 under the proper construction, the Board should be reversed and claim 40 should be found unpatentable over PenPoint. *ABT Sys.*, 797 F.3d at 1357.

## V.    Claims 41-42 are unpatentable because claim 40 is unpatentable.

Claims 41 and 42 depend from claim 40 and were found patentable by the Examiner only based on their dependency from claim 40. A3789. The Board affirmed the Examiner's confirmation of claims 41 and 42 on the same ground. Thus, because claims 41 and 42 have no separate basis for patentability other than for claim 40, claims 41 and 42 are likewise unpatentable. For this reason, the Board should be reversed and claims 41 and 42 should be found unpatentable.

## CONCLUSION AND PRAYER

For the foregoing reasons, the Appellants urge the Court to reverse the Board's decision affirming the Examiner's confirmation of claims 40-42 and order claims 40-42 rejected.

Respectfully Submitted,

*/s/ Debra J. McComas*
Debra J. McComas
Andrew S. Ehmke
Michael S. Parsons
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas  75219
Telephone: 214.651.5375
Facsimile: 214.200.0525
Debbie.McComas@haynesboone.com
Andy.Ehmke@haynesboone.com
Michael.Parsons@haynesboone.com

**Attorneys for Appellants,**
**Motorola Mobility LLC and Google Inc.**

## ECF CERTIFICATION

I hereby certify that (i) the required privacy redactions have been made pursuant to Federal Rule of Civil Procedure 5.2; (ii) the electronic submission is an exact copy of the paper document; (iii) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues.

*/s/ Debra J. McComas*
Debra J. McComas

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

■     this brief contains 6,346 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

■     this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.

*/s/ Debra J. McComas*
Debra J. McComas

15465108

38

Form 30

FORM 30. Certificate of Service

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on ___December 7, 2015___
by:

        ☐ U.S. Mail

        ☐ Fax

        ☐ Hand

        ☒ Electronic Means (by E-mail or CM/ECF)

| Debra J. McComas | /s/ Debra J. McComas |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Haynes and Boone, LLP |
| Address | 2323 Victory Avenue, Suite 700 |
| City, State, Zip | Dallas, Texas  75219 |
| Telephone Number | 214.651.5376 |
| Fax Number | 214.200.0525 |
| E-Mail Address | debbie.mccomas@haynesboone.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

FORM 30. Certificate of Service

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE
## FOR CORRECTED APPELLANT'S BRIEF

I certify that I served a copy on counsel of record on  December 8, 2015
by:

□ U.S. Mail

□ Fax

□ Hand

&#9635; Electronic Means (by E-mail or CM/ECF)

Debra J. McComas                              /s/ Debra J. McComas

Name of Counsel                              Signature of Counsel

Law Firm            Haynes and Boone, LLP

Address             2323 Victory Avenue, Suite 700

City, State, Zip    Dallas, Texas  75219

Telephone Number    214.651.5376

Fax Number          214.200.0525

E-Mail Address      debbie.mccomas@haynesboone.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

# Decision of Patent Trial and Appeal Board

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,267 | 09/14/2012 | 6339780 | 49523.2 | 3168 |

26119       7590       06/17/2015
KLARQUIST SPARKMAN LLP
121 S.W. SALMON STREET
SUITE 1600
PORTLAND, OR 97204

| EXAMINER |
|---|
| KISS, ERIC B |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/17/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

MOTOROLA MOBILITY LLC
Requester, Appellant, and Cross-Respondent

v.

MICROSOFT CORP.
Patent Owner, Respondent, and Cross-Appellant

————————

Appeal 2015-001463
*Inter partes* Reexamination Control 95/002,267
United States Patent 6,339,780 B1
Technology Center 3900

————————

Before JOHN A. JEFFERY, ANDREW J. DILLON, and
JEREMY J. CURCURI, *Administrative Patent Judges*.

JEFFERY, *Administrative Patent Judge*.

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

## DECISION ON APPEAL

Requester appeals under 35 U.S.C. §§ 134 and 315 the Examiner's decision to not reject claims 40–42. TPR App. Br. 2.[1] Patent Owner cross-appeals under 35 U.S.C. §§ 134 and 315 the Examiner's decision to reject claims 1–39. PO App. Br. 1.

We have jurisdiction under 35 U.S.C. §§ 134 and 315, and we heard the appeal on May 27, 2015. We affirm.

## STATEMENT OF THE CASE

This proceeding arose from a request for *inter partes* reexamination filed on September 14, 2012 of United States Patent 6,339,780 ("the '780 patent"), issued to Shell et al.

The '780 patent describes a hypermedia browser on a portable computer that loads and displays content in a content viewing area. While the browser loads content, the browser displays a temporary graphic element over the content viewing area. The element is removed after content is loaded, allowing unobstructed viewing of the loaded content. *See generally* Abstract. Claims 1 and 40 are illustrative of the invention and reproduced below:

---

[1] Throughout this opinion, we refer to (1) the Right of Appeal Notice mailed February 26, 2014 ("RAN"); (2) Requester's Appeal Brief filed May 23, 2014 ("TPR App. Br."); (3) Patent Owner Respondent's Brief filed June 23, 2014 ("PO Resp. Br."); (4) the Examiner's Answer mailed August 25, 2014 ("Ans.") (incorporating the RAN by reference); (5) Requester's Rebuttal Brief filed September 24, 2014 ("TPR Reb. Br."); (6) Patent Owner's Appeal Brief filed June 20, 2014 ("PO App. Br."); (7) Requester's Respondent Brief filed July 15, 2014 ("TPR Resp. Br."); and (8) Patent Owner's Rebuttal Brief filed September 25, 2014 ("PO Reb. Br.").

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

1.  A hypermedia browser embodied on a computer-readable medium for execution on an information processing device having a limited display area, wherein the hypermedia browser has a content viewing area for viewing content and is configured to display a temporary graphic element over the content viewing area during times when the browser is loading content, wherein the temporary graphic element is positioned over the content viewing area to obstruct only party of the content in the content viewing area, wherein the temporary graphic element is not content and wherein content comprises data for presentation which is from a source external to the browser.

40.  An information processing device comprising:

a processor;

a display;

a hypermedia browser executing on the processor to load and display content in a content viewing area on the display;

wherein the hypermedia browser is configured to operate in a content-loading mode and a content-loaded mode;

in the content-loaded mode, the hypermedia browser displays loaded content in the content viewing area and no "load status" graphic element is displayed, wherein absence of such "load status" graphic element indicates that the browser is in the content-loaded mode;

in the content-loading mode, the hypermedia browser loads content, displays such content in the content viewing area as it loads, and diplays a "load status" graphic element over the content view area obstructing part of the content displayed in the content viewing area, wherein presence of such "load status" graphic element indicates that the browser is in the content-loading mode; and

3

**A4**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

>    wherein content comprises data for presentation which is
>    from a source external to the browser.


RELATED PROCEEDINGS

This appeal is said to be related to four proceedings, one of which is pending. TPR App. Br. 1; PO App. Br. 1.


THE APPEALED REJECTIONS AND PROPOSED REJECTIONS

Requester appeals the Examiner's not rejecting claims 40–42 under 35 U.S.C. § 103(a) as obvious over GO CORP., PENPOINT™ UI DESIGN GUIDELINES (1991) ("PenPoint UI Guidelines") and GO CORP., PENPOINT™ ARCHITECTURAL REFERENCE VOL. II (1992) ("PenPoint Architectural Reference"). RAN 20.

Patent Owner cross-appeals the Examiner's rejecting the claims as follows:

Claims 1–39 under 35 U.S.C. § 103(a) as unpatentable over PenPoint UI Guidelines and PenPoint Architectural Reference. RAN 19.

Claims 1, 3, 5, 6, 9, and 11 under 35 U.S.C. § 103(a) as unpatentable over Nguyen (US 6,584,498 B2; June 24, 2003) and P. HONEYMAN ET AL., THE LITTLE WORK PROJECT (1992) ("Honeyman"). RAN 19.

Claim 4 under 35 U.S.C. § 103(a) as unpatentable over Nguyen, Honeyman, and Staub (US 5,546,507; Aug. 13, 1996). RAN 19–20.


THE PROPOSED REJECTION OF CLAIMS 40–42

The Examiner finds that because content is not displayed as it loads in the cited PenPoint references, claims 40–42 would not have been obvious

4

**A5**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

over these references, particularly in light of the two recited modes
pertaining to loading and loaded content. RAN 13–14, 20. Patent Owner
concurs with these findings and conclusions. PO Resp. Br. 2–8.

Requester argues that the Examiner's limiting the "as it loads"
limitation to displaying only partially-loaded content is unreasonable.
According to Requester, the "as it loads" limitation includes displaying all
loaded content while still in the "content-loading mode," namely while
PenPoint's "busy clock" is shown, such as when the device loads content
from an external source. TPR App. Br. 4–14; TPR Reb. Br. 1–6.


ISSUE

Under § 103, has the Examiner erred in declining to reject claims 40–
42 by finding that the cited PenPoint references do not teach or suggest
displaying content as it loads?


ANALYSIS

We begin by noting, as does the Examiner (RAN 13), that
independent claim 40 recites two modes. The first mode is a content-*loaded*
mode where a browser displays *loaded* content in a content viewing area, but
does not display a "load status" graphic element. The second mode is a
content-*loading* mode where the browser (1) loads content; (2) displays such
content in the viewing area *as it loads*, and (3) displays the graphic element
over the area obstructing part of the displayed content.

There is no dispute that PenPoint's busy clock is a graphic element
that is displayed temporarily. Although PenPoint does not state explicitly

5

**A6**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

that the busy clock is displayed while content loads, PenPoint's busy clock
nevertheless indicates that a machine is "alive" if a command's result does
not appear instantly.  PenPoint UI Guidelines, at 64.  Notably, the busy clock
can appear when a computer performs time-consuming work, such as
*copying large files across a network.*  PenPoint Architectural Reference, at
193.  This functionality, then, at least suggests displaying the busy clock
when a browser loads content by, for example, copying large files across a
network, the content of which could be rendered in the browser.  Even
assuming, without deciding, that the cited PenPoint references do not state
explicitly that this copied content is loaded and displayed in a browser, and
could be used for other purposes, loading this content in a browser would
have nevertheless been at least an obvious variation within the level of
ordinary skill in the art.  Nor has Patent Owner shown persuasively that such
a variation would have been uniquely challenging or otherwise beyond the
level of ordinarily skilled artisans.  *See Leapfrog Enters., Inc. v. Fisher-
Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

    To be sure, Dr. Gottesman declares that the busy clock merely
indicates that the system is busy, and not whether content is loading.
Gottesman Decl. ¶¶ 112–114.  Although we appreciate Dr. Gottesman's
insights in this regard, the cited PenPoint references nevertheless at least
suggest displaying the busy clock while content loads in a browser—a time
when the system is busy.  Notably, *all* PenPoint applications (1) launch the
busy clock automatically if they take more than about one-half second to
respond to an input event, and then (2) remove the busy clock when they are
no longer busy.  PenPoint Architectural Reference, at 193.  This

6

**A7**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

functionality only bolsters the notion that displaying the busy clock while
content loads in a browser would have been obvious during this busy period.

Figure 45 of the PenPoint UI Guidelines likewise teaches positioning
the temporary graphic element over the content viewing area to obstruct part
of the content in that area as claimed. Patent Owner's contentions to the
contrary (PO Resp. Br. 7–8; Gottesman Decl. ¶ 117) are unavailing in light
of Figure 45 of the PenPoint UI Guidelines. Even assuming, without
deciding, that the busy clock in Figure 45 can be displayed during operations
when the system is busy other than loading content, positioning the busy
clock as shown in that figure to indicate loading content in a browser would
have been at least an obvious variation for those of ordinary skill and
creativity. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 421 (2007) ("A
person of ordinary skill is also a person of ordinary creativity, not an
automaton.").

Therefore, we agree with Requester to the extent that displaying
PenPoint's busy clock while loading content from an external source would
have been at least an obvious variation. *See* TPR App. Br. 14; TPR Reb. Br.
5. But that does not mean that this content is *displayed as it loads*. Rather,
as Requester acknowledges, the busy clock appears *until the content is
loaded and appears on the display*. TPR App. Br. 14. So even assuming,
without deciding, that the busy clock is displayed when *all* the *loaded*
content is displayed as Requester seems to suggest (*see id.*), this content is
not displayed *as* it loads, but rather *after* it loads. To construe the content-
*loading* mode to include displaying *all loaded* content (i.e., after it loads
completely) as Requester suggests would conflate the distinct temporal

7

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

aspects of the two recited modes, namely displaying content during and after loading, respectively.

To be sure, the *loading* content displayed in the browser's viewing area in Figure 3 of the '780 patent appears strikingly similar to the *loaded* content shown in Figure 4, except for the temporary graphic element 64 as Requester indicates. TPR App. Br. 12–13; TPR Reb. Br. 3–4. But this similarity does not mean necessarily that it is the *same* displayed content. As Patent Owner indicates, Figure 3 is a static view of a dynamic process (PO Resp. Br. 6) and, therefore, can be a snapshot of the content as it is loaded.

Moreover, even images that are *visibly* similar, such as those in Figures 3 and 4 of the '780 patent, can have different content. For example, displayed images that appear identical may have different resolutions, or include invisible elements that are displayable once they are loaded (e.g., graphic elements with the same foreground and background color, watermarks, etc.). In these examples, the displayed content would differ during and after loading, yet appear visibly similar.

Therefore, because the cited PenPoint references do not teach or suggest displaying content *as it loads* in the recited content-loading mode, and displaying *loaded* content in the content-loaded mode, we are not persuaded that the Examiner erred by not rejecting claims 40–42.

THE REJECTION OF CLAIMS 1–39

The Examiner finds that the PenPoint UI Guidelines and Architectural Reference collectively would have taught or suggested every recited element

8

**A9**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

of claims 1–39 for the reasons indicated on pages 42 to 85 of Exhibit AA of
the Request filed Sept. 14, 2012 ("Request") that the Examiner incorporates
by reference.  RAN 19.

Patent Owner argues that even if PenPoint's busy clock is displayed
while content is loaded, it is also displayed at other times, and, therefore, is
not displayed only when the browser loads content.  PO App. Br. 6–8; PO
Reb. Br. 1–9.  Patent Owner adds that PenPoint's busy clock is displayed
outside the content viewing area and, therefore, is not displayed only in the
content viewing area.  PO App. Br. 7–8.

Requester contends that claim 1 does not require displaying a
temporary graphic element only when the browser loads content, let alone
require displaying this element only in the content viewing area as Patent
Owner alleges.  TPR Resp. Br. 4–6.  *Accord* RAN 4–5 (agreeing with
Requester on these points).

ISSUES

Under § 103, has the Examiner erred by finding that the PenPoint UI
Guidelines and Architectural Reference collectively would have taught or
suggested:

(1) a hypermedia browser configured to display a temporary graphic
element over a content viewing area during times when the browser is
loading content, where the element is positioned over that area to obstruct
only part of the content in the area as recited in claim 1?

9

**A10**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

(2) the browser is configured to display the temporary graphic element over the content viewing area only during times when the browser is loading visible content as recited in claim 2?

(3) the temporary graphic element indicates to a user that the browser is loading content as recited in claim 3?

(4) the temporary graphic element disappears when the browser's loading content is complete to indicate that condition to a user as recited in claim 4?

(5) the temporary graphic element conveys browser status information as recited in claim 9?

(6) the temporary graphic element is positioned only over a portion of the content viewing area as recited in claim 12?

(7)(a) loading content from a hyperlink resource responsive to user selection of hyperlinks contained in said content; (b) displaying the content in a content viewing area; and (c) displaying a temporary graphic element over the content viewing area during the loading step, where these three steps occur at least partially concurrently as recited in claim 19?

ANALYSIS

*Claims 1, 5–8, 10, and 11*

We sustain the Examiner's rejection of claim 1 for the reasons indicated by the Examiner and Requester. Despite Patent Owner's arguments to the contrary (PO App. Br. 6–8; PO Reb. Br. 1–9), we see no error in the Examiner's rejection of claim 1 that incorporates pages 42 to 51 of the Request. *See* RAN 19. As Requester indicates, claim 1 does not

10

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

require displaying a temporary graphic element *only* when the browser loads content, let alone require displaying this element *only* in the content viewing area as Patent Owner alleges.  TPR Resp. Br. 4–6.  *Accord* RAN 4–5 (agreeing with Requester on these points).  Nor does claim 1 recite removing this element.  Rather, claim 1 recites, in pertinent part, that the browser is configured to display a temporary graphic element over the content viewing area to obstruct only part of the content in that area.

There is no dispute that PenPoint's busy clock is a graphic element that is displayed temporarily.  Although PenPoint does not state explicitly that the busy clock is displayed while content loads, PenPoint's busy clock nevertheless indicates that a machine is "alive" if a command's result does not appear instantly.  PenPoint UI Guidelines, at 64.  Notably, the busy clock can appear when a computer performs time-consuming work, such as *copying large files across a network*.  PenPoint Architectural Reference, at 193.  This functionality, then, at least suggests displaying the busy clock when a browser loads content by, for example, copying large files across a network, the content of which could be rendered in the browser.  Even assuming, without deciding, that the cited PenPoint references do not state explicitly that this copied content is loaded and displayed in a browser, and could be used for other purposes, loading this content in a browser would have nevertheless been at least an obvious variation within the level of ordinary skill in the art.  Nor has Patent Owner shown persuasively that such a variation would have been uniquely challenging or otherwise beyond the level of ordinarily skilled artisans.  *See Leapfrog*, 485 F.3d at 1162.

11

**A12**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

To be sure, Dr. Gottesman declares that the busy clock merely indicates that the system is busy, and not whether content is loading. Gottesman Decl. ¶¶ 34–38. Although we appreciate Dr. Gottesman's insights in this regard, the weight of the evidence on this record nevertheless favors the Examiner's position to the extent that the cited PenPoint references at least suggest displaying the busy clock while content loads in a browser—a time when the system is busy. Notably, *all* PenPoint applications (1) launch the busy clock automatically if they take more than about one-half second to respond to an input event, and then (2) remove the busy clock when they are no longer busy. PenPoint Architectural Reference, at 193. This functionality only bolsters the Examiner's position that displaying the busy clock while content loads in a browser would have been obvious during this busy period.

Nor are we persuaded of error in the Examiner's reliance on Figure 45 of the PenPoint UI Guidelines for teaching positioning the temporary graphic element over the content viewing area to obstruct only part of the content in that area as claimed. RAN 19 (incorporating page 48 of the Request). Patent Owner's contention that Figure 48 of PenPoint UI Guidelines does not display the temporary graphic element *only* in the content viewing area (PO App. Br. 8) is not commensurate with the scope of the claim and, in any event, does not persuasively rebut the Examiner's reliance on Figure 45 that shows positioning the busy clock over the content viewing area to partially obstruct content in that area.

Even assuming, without deciding, that the busy clock in Figure 45 is displayed during operations when the system is busy other than loading

12

**A13**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

content as Patent Owner contends (PO App. Br. 8), positioning the busy
clock as shown in that figure to indicate other times when the system is
busy, including loading content in a browser, would have been at least an
obvious variation for those of ordinary skill and creativity. *See KSR*, 550
U.S. at 421 ("A person of ordinary skill is also a person of ordinary
creativity, not an automaton.").

Although Patent Owner argues that PenPoint's displaying the busy
clock when no content is loaded teaches away from the claimed invention
(PO App. Br. 9–10), nothing on this record indicates that the cited PenPoint
references criticize, discredit, or otherwise discourage investigation into the
invention claimed as required for teaching away. *See Norgren Inc. v. Int'l
Trade Comm'n*, 699 F.3d 1317, 1326 (Fed. Cir. 2012); *see also In re Kahn*,
441 F.3d 977, 990 (Fed. Cir. 2006).

Therefore, we are not persuaded that the Examiner erred in rejecting
claim 1, and claims 5–8, 10, and 11 not argued separately with particularity.

*Claim 2*

We also sustain the Examiner's rejection of claim 2 reciting that the
browser is configured to display the temporary graphic element over the
content viewing area *only* during times when the browser is loading *visible*
content. We see no error in the Examiner's position that the recited display
limitation is at least suggested by the cited PenPoint references in view of
the PenPoint UI Guidelines teaching displaying the busy clock only when
the browser is busy (e.g., loading content) as noted on page 52 of the
Request that the Examiner incorporates by reference. *See* RAN 19. As the

13

**A14**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

Examiner and Requester indicate, the claim does not require that visible content appear on the screen as it loads, let alone appear concurrently with the temporary graphic element.  TPR Resp. Br. 6; RAN 6 (agreeing with Requester on this point).

Even assuming, without deciding, that PenPoint's busy clock in Figure 45 is displayed when no content loads as Patent Owner contends (PO App. Br. 8; Gottesman Decl. ¶ 52), positioning the busy clock as shown in that figure to indicate that the system is busy only when the browser loads visible content would have been at least an obvious variation for those of ordinary skill and creativity.  *See KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.").

Although not all content loaded in a browser is visible (e.g., markup language tags, executable code, scripts, etc.), displaying the temporary graphic element only when visible content is loaded in the browser would have nevertheless been at least an obvious variation within the level of ordinary skill in the art.  Nor has Patent Owner shown persuasively that such a variation would have been uniquely challenging or otherwise beyond the level of ordinarily skilled artisans.  *See Leapfrog*, 485 F.3d at 1162.  Patent Owner's arguments (PO App. Br. 8–10) are, therefore, unavailing and not commensurate with the scope of the claim for the reasons noted previously.

*Claim 3*

We also sustain the Examiner's rejection of claim 3 reciting that the temporary graphic element indicates to a user that the browser is loading content for the reasons noted previously and those indicated by the Examiner

14

**A15**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

and Requester.  RAN 6, 19 (incorporating pages 52 and 53 of the Request by reference); TPR Resp. Br. 7.  Patent Owner's arguments (PO App. Br. 10–11) are unavailing for the reasons noted previously.

*Claim 4*

We also sustain the Examiner's rejection of claim 4 reciting that the temporary graphic element disappears when the browser's loading content is complete to indicate that condition to a user.  Patent Owner contends that because PenPoint's busy clock does not indicate solely completing content loading, but rather indicates other events when the system is busy, removing the busy clock would not *only* indicate that the system has finished loading content.  PO App. Br. 11–12.  Dr. Gottesman declares that the busy clock's disappearance would merely indicate that the system is no longer busy—not that any particular operation is completed.  Gottesman Decl. ¶ 58.

We find that the weight of the evidence on this record, however, favors the Examiner's position.  As Requester indicates, claim 4 does not require that removing the temporary graphic element *only* indicates completion of content loading.  TPR Resp. Br. 8; RAN 7 (agreeing with Requester on this point).  Nor do we find error in the Examiner's reliance on the "busyOff" arguments in the code on page 193 of the PenPoint Architectural Reference that remove the busy clock when a time-consuming task is completed, such as completing copying large files over a network.  RAN 7.  This functionality, then, at least suggests that indicating to a user that content loading is complete when the busy clock disappears would have been at least an obvious variation for those of ordinary skill in the art.

15

**A16**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

*Claim 9*

We also sustain the Examiner's rejection of claim 9 reciting that the temporary graphic element conveys browser status information. Despite Patent Owner's arguments to the contrary (PO App. Br. 12–13), nothing in the claim precludes PenPoint's busy clock conveying a busy status of the system—including the browser as at least an obvious variation—for the reasons indicated previously, and those indicated by the Examiner and Requester. TPR Resp. Br. 9; Request 58; RAN 8.

*Claims 12, 13, 15, and 16*

We also sustain the Examiner's rejection of independent claim 12 for reasons similar to those indicated previously, and by the Examiner and Requester. Request 61–66; RAN 8–9. Patent Owner's contention that claim 12 covers situations where content loading may overlap with displaying that content, and that PenPoint is deficient in this regard (PO App. Br. 14), is unavailing and not commensurate with the scope of the claim. As noted above regarding claim 2, nothing in the claim requires that visible content appear on the screen as it loads, let alone appear concurrently with the temporary graphic element.

To be sure, claim 12 recites that the temporary graphic element (1) is displayed when the browser is *loading visible content*, and (2) obstructs only part of *the visible content* in the content viewing area. But nothing in the claim requires that the visible content that the browser is *loading* is the *same* visible content in the viewing area that is obstructed; the obstructed content

16

**A17**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

could have been loaded previously. Therefore, to the extent that Patent
Owner argues that claim 12 is limited to loading and displaying visible
content concurrently such that content is displayed *as it loads* similar to
claim 40 (*see* PO App. Br. 14; Gottesman Decl. ¶ 71), such a contention is
not commensurate with the scope of the claim.

Claim 12 further differs from claim 1 and its dependent claims by
reciting, in pertinent part, that the temporary graphic element is positioned
*only* over a portion of the content viewing area. Nevertheless, this
placement is at least suggested by at least Figure 45 of the PenPoint UI
Guidelines that shows positioning the busy clock only over the content
viewing area to partially obstruct content in that area.

Therefore, we are not persuaded that the Examiner erred in rejecting
independent claim 12, and claims 13, 15, and 16 not argued separately with
particularity.

*Claim 19*

We also sustain the Examiner's rejection of claim 19 reciting, in
pertinent part, (1) loading content from a hyperlink resource responsive to
user selection of hyperlinks contained in said content; (2) displaying the
content in a content viewing area; and (3) displaying a temporary graphic
element over the content viewing area during the loading step, where these
three steps occur at least partially concurrently.

Despite Patent Owner's arguments to the contrary (PO App. Br. 15–
16), nothing in the claim requires that the content that is loaded is the same
as that displayed in the content viewing area. Rather, the content could be

17

**A18**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

different as Requester indicates. TPR Resp. Br. 10; RAN 10 (agreeing with Requester on this point). Therefore, unlike independent claim 40, nothing in claim 19 precludes displaying the busy clock concurrently with text (content) in Figure 45 of the PenPoint UI Guidelines while the browser loads additional content as noted on pages 69 to 72 of the Request that the Examiner incorporates by reference. RAN 19.

Patent Owner's contention that claim 19 requires that content is *visible* to the user while it is loaded, and displayed concurrently with the temporary graphic element (PO App. Br. 15–16), is unavailing and not commensurate with the scope of the claim. Unlike claims 2 and 12, claim 19 does not recite *visible* content, let alone that such content is displayed as it loads similar to claim 40. Patent Owner's reference to paragraphs 70 and 71 of Dr. Gottesman's Declaration (*id.* at 16) is likewise unavailing in this regard, for those cited paragraphs pertain to claim 12 (which *does* recite visible content)—not claim 19.

Therefore, we are not persuaded that the Examiner erred in rejecting claim 19.


*Claim 24*

We also sustain the Examiner's rejection of claim 24 reciting removing the temporary graphic element once the loading step is complete to indicate to a user that condition. Patent Owner reiterates arguments similar to those made for claim 4 (*see* PO App. Br. 4) that we find unpersuasive for the reasons previously discussed, and those indicated by the Examiner and Requester. RAN 11; Request 74; TPR Resp. Br. 11.

18

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

THE REJECTION OF CLAIMS 14, 17, 18, 20–23, and 25–39

We also sustain the Examiner's rejection of claims 14, 17, 18, 20–23, and 25–39.  Despite nominally arguing these claims separately, Patent Owner reiterates similar arguments made in connection with claims 1, 3, 4, 6, 10–12, and 19 (PO App. Br. 14, 17–19) that we find unpersuasive for the reasons previously discussed.

THE REMAINING REJECTIONS

Because our decision is dispositive regarding patentability of all appealed claims based on the foregoing prior art references, we need not reach the merits of the Examiner's decision to also reject claims 1, 3–6, 9, and 11 over Nguyen, Honeyman, and Staub.  RAN 19–20.  *See Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984) (approving ITC's determination based on a single dispositive issue, and not reaching other issues not decided by the lower tribunal).

CONCLUSION

Under § 103, the Examiner did not err in rejecting claims 1–39 and not rejecting claims 40–42.

ORDER

The Examiner's decision rejecting claims 1–39 and not rejecting claims 40–42 is affirmed.

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1

Requests for extensions of time in this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 1.956. *See* 37 C.F.R. § 41.79.

In the event neither party files a request for rehearing within the time provided in 37 C.F.R. § 41.79, and this decision becomes final and appealable under 37 C.F.R. § 41.81, a party seeking judicial review must timely serve notice on the Director of the United States Patent and Trademark Office. *See* 37 C.F.R. §§ 90.1 and 1.983.


<u>AFFIRMED</u>

bar

20

**A21**

Appeal 2015-001463
Reexamination Control 95/002,267
Patent US 6,339,780 B1


FOR REQUESTOR:

Andrew S. Ehmke
HAYNES & BOONE LLP
2323 Victory Ave., Suite 700
Dallas, TX 75219


FOR PATENT OWNER:

KLARQUIST SPARKMAN LLP
121 S.W. Salmon Street
Suite 1600
Portland, OR 97204

21