**2015-2061**

# United States Court of Appeals
# for the Federal Circuit

MOTOROLA MOBILITY LLC, and GOOGLE, INC.,

*Appellants,*

v.

MICROSOFT CORPORATION,

*Appellee.*

*Appeal from the U.S. Patent and Trademark Office*
*Patent Trial and Appeal Board in Reexamination no. 95/002,267*
*PTAB No. 2015-001463*

## BRIEF OF APPELLEE MICROSOFT CORPORATION

JOSEPH T. JAKUBEK
TODD M. SIEGEL
JOHN D. VANDENBERG
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204-2988
(503) 595-5300
joseph.jakubek@klarquist.com
todd.siegel@klarquist.com
john.vandenberg@klarquist.com

*Counsel for Appellee*
*Microsoft Corporation*

JANUARY 12, 2016

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## *MOTOROLA MOBILITY LLC v. MICROSOFT CORP.*
## No. 15-2061

## CERTIFICATE OF INTEREST

Counsel for Appellee certifies the following:

1.  The full name of every party or amicus represented by me is:

    **Microsoft Corporation**

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    **Microsoft Technology Licensing, LLC (of Redmond Washington), a wholly owned subsidiary of Microsoft Corporation, is the real party in interest by virtue of an assignment of the patent at issue in this appeal by Microsoft Corporation to Microsoft Technology Licensing, LLC.**

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

    **There is no parent corporation and no other publicly held corporation owns 10% or more stock of Microsoft Corporation.**

4.  The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

    **KLARQUIST SPARKMAN, LLP: Joseph T. Jakubek, Todd M. Siegel, and John D. Vandenberg.**

January 12, 2016                                    /s/Joseph T. Jakubek
                                                    Signature of counsel

                                                    Joseph T. Jakubek
                                                    Printed name of counsel

i

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF RELATED CASES ...................................................... 1

STATEMENT OF THE ISSUES................................................................ 1

INTRODUCTION ................................................................................ 2

STATEMENT OF THE CASE ............................................................... 4

    A.    The Reexamination Proceedings .............................................. 4

        1.    Motorola's Obviousness Challenge
             Relied Entirely On The "Busy Clock." ........................... 4

        2.    The Examiner Rejected Motorola's Position. ................. 5

        3.    The Board Rejected Motorola's Position. ....................... 5

STATEMENT OF THE FACTS ............................................................... 6

    A.    Microsoft's Invention
        Displays Content As It Loads. ................................................. 6

    B.    Claims 40-42 Require
        Displaying Content As It Loads. ............................................ 8

    C.    The Specification Describes
        Displaying Content As It Loads. ........................................... 10

    D.    The Busy Clock Does
        Not Display Content As It Loads. ........................................ 12

    E.    The Claimed Load-Status Element
        And The Prior Art Busy Clock Behave
        Differently To Convey Different Messages. ........................... 14

F.    An Expert Explained The
      Differences Between The Claimed
      Invention And The Prior Art Busy Clock............................16

SUMMARY OF THE ARGUMENT .........................................................18

ARGUMENT ..........................................................................................20

   A.    The Judgment Should Be
         Affirmed Because The Blue Br. Lacks
         A *Prima Facie* Showing Of Obviousness...............................20

   B.    The Judgment Should Be Affirmed
         Because "As" Means "While," Not "After." ...........................23

   C.    The Judgment Should Be Affirmed
         Because The Appeal Rests Upon A Fictional
         Claim Construction The Board Did Not Adopt....................28

   D.    The Judgment Should Be
         Affirmed Because PenPoint Did Not
         Render The Claimed Combination Obvious. ........................30

CONCLUSION ......................................................................................31

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1 (1966) ..................................................................................21

**Statutes**

35 U.S.C. § 103.......................................................................... 18, 20, 22

**Rules**

Fed. Cir. R. 47.5 ..................................................................................... 1

**Other Authorities**

Webster's Third New International Dictionary Of the English
   Language, Unabridged (1993) ...........................................................24

## STATEMENT OF RELATED CASES

This appeal arises from *inter partes* reexamination no. 95/002,267, in which the Patent Trial and Appeal Board issued a final decision affirming the Examiner's rejection of claims 1-39 of U.S. Patent No. 6,339,780 (the '780 patent) and refusal to reject claims 40-42. No "appeal in or from the same [*inter partes* reexamination] was previously before this or any other appellate court." Fed. Cir. R. 47.5.

## STATEMENT OF THE ISSUES

1.     Whether Motorola's Blue Br. presents a *prima facie* showing of obviousness.

2.     Whether, as Microsoft urges, the broadest reasonable interpretation of displaying content "as it loads" requires displaying the content while it loads, *i.e.*, before it completes loading.

3.     Whether, as Motorola urges, the Board interpreted the claims to prohibit displaying all of the content at the end of the content-loading period.

4.     Whether the record shows that a skilled artisan would have changed the message and the behavior of the sole prior art element to be that of the claimed invention.

1

**INTRODUCTION**

Microsoft's patent claims carefully delineate their claimed invention. The temporary presence of a special graphical element on a computer screen displaying a Web page indicates that the Web page is still being loaded, while the element's disappearance indicates that it has finished loading. The Web-page content is displayed "as it loads," meaning, of course, that the content is displayed *while* it loads not just *after* it has fully loaded. A theatrical counterpart is leaving the curtain up as stagehands change scenery between acts.

Motorola lodged a perfunctory challenge asserting obviousness over a prior art "busy clock" whose message and behavior are nothing like the claimed indicator of a Web page's loading status. This busy clock indicates that an apparently frozen, non-responsive computer in fact is still working, but too busy on other tasks to immediately change the display in response to the user's input. Because it disappears once the computer starts to change the display, it cannot indicate when the Web page's loading has *completed*—as does the claimed invention.

The Court should affirm the Patent Office's rejection of this obviousness challenge, for four reasons.

First, the Corrected Appellants' Brief (ECF No. 22) ("Blue Br.") omits three mandatory statutory elements: (1) the level of ordinary skill in the art, (2) the differences between the prior art and the claimed invention, and (3) analysis of the claim as a whole.

Second, Motorola's appeal depends on changing the claim language "as it loads" to "after it loads," for no valid reason. If someone asks their spouse to watch the stovetop "as I load the dishwasher," that does not mean wait until *after* the dishwasher is fully loaded to check if anything has boiled over.

Third, Motorola built its appeal on a fiction: that the Board construed the claim to prohibit display of the fully loaded content at the end of content loading. (*See* Blue Br. at 3, 5, 17, 19-20, 21, 22, 28, 29, 33.) The Board did nothing of the kind. Instead, it simply noted that waiting to display the content until after it is fully loaded is *not* displaying the content as it loads. Raising the curtain only after the new scenery has been fully loaded and arranged on stage is not the same as leaving the curtain up as the stagehands do their job.

Fourth, Motorola's appeal requires overhauling the prior art busy clock beyond recognition—to make it resemble the claimed "load status"

element. It would force the busy clock to remain displayed well after the computer was no longer too busy to display new external content, thereby defeating its mission of indicating that the computer is too busy to update its display in response to a user's input. The Board correctly rejected such a hindsight overhaul of this inapposite prior art.

## STATEMENT OF THE CASE

### A.    The Reexamination Proceedings

#### 1.    Motorola's Obviousness Challenge Relied Entirely On The "Busy Clock."

Motorola sought reexamination of the three claims on appeal (claims 40-42) based entirely on the "busy clock" element as described in a few pages from the two prior art PenPoint references. (A84-A85, A1341-A1342, A1427-A1431.)[1] Its request on this ground included no expert testimony, no evidence of the level of knowledge or skill in the art, no supposed admitted art, no evidence of design incentives or market forces, no evidence of known problems recognized in the art, no evidence of simultaneous invention, and no alleged objective indicia of obviousness.

---

[1] The Blue Br. cites alleged "admitted art", but waived such reliance by not citing it as part of its obviousness challenge to the claims on appeal, in its request for reexamination request. (A84-A85, A1341-A1342, A1427-A1431.)

## 2.    The Examiner Rejected Motorola's Position.

The cited prior art pages do not describe displaying the external content before it has completed loading, unlike the challenged patent which discloses displaying external content during loading. This difference led Motorola to argue that displaying content only after it completes loading is displaying the content "as it loads." The Examiner rejected this as unreasonable. (A3882.) It is, the Examiner explained, "unreasonable in light of the explicit recitation of two modes of operation in claim 40, i.e., a content-loading mode (which displays content as it loads) and a content-loaded mode (which displays loaded content)." (*Id*.) The Examiner accordingly refused to reject these claims for obviousness over this prior art.

## 3.    The Board Rejected Motorola's Position.

The Board affirmed the Examiner, also rejecting as unreasonable Motorola's position that displaying content only after it completes loading constitutes displaying content "as it loads," and found that PenPoint's displaying content *after* it loads does not teach displaying the content *as* it loads:

> But that does not mean that this content is *displayed as it loads.* Rather, as Requester acknowledges, the busy clock

appears *until the content is loaded and appears on the display.* TPR App. Br. 14. So even assuming, without deciding, that the busy clock is displayed when *all* the *loaded* content is displayed as Requester seems to suggest *(see id.),* this content is not displayed *as* it loads, but rather *after* it loads. To construe the content-*loading* mode to include displaying *all loaded* content (i.e., after it loads completely) as Requester suggests would conflate the distinct temporal aspects of the two recited modes, namely displaying content during and after loading, respectively. (A8-A9.) (Emphasis in original.)

In its Decision, the Board did *not* find "that PenPoint teaches all of the limitations of claim 40 except for 'displays such contents . . . as it loads.' A6-A8." (Blue Br. at 34.)

## STATEMENT OF THE FACTS

### A.    Microsoft's Invention
Displays Content As It Loads.

Microsoft's patent discloses a Web browser for loading Web pages with images and text. In 1997, such Web pages sometimes loaded slowly onto a hand-held computer. The Web page's title might load first, gradually followed by more text and images, leaving the user to wonder if the full page had finally loaded. "Significant delays" could be encountered when loading such external content. (A27 ('780 1:64-2:2).)

Microsoft's claimed invention does not speed the loading of the page but rather keeps the user informed of the status of that loading. It

displays a "load status" graphic whose presence indicates that the content is still loading and whose disappearance indicates that the loading is complete. (A28 ('780 4:53-63), A29 ('780 5:4-6).) To clearly define this behavior, the patent distinguishes between two time periods: the "content-loading" period versus the "content-loaded" period. The browser has different modes of operation during these distinct time periods. During the first, content-loading period, the browser displays the content "as it loads" and displays a temporary "load status" graphic element over the content-viewing window to alert the user that content is still loading. But once the content is fully loaded, the browser switches to its second, content-loaded mode, and removes the temporary content-loading "load status" graphic element, to alert the user that the content loading has completed. (A30-A31 ('780 claim 40).)

For example, assume that it takes ½ second from a user's selection of a new Web page to load and display the title of that Web page and an additional 9 ½ seconds to complete loading of the entire page with all of its images in their full resolution. During that 10-second content-loading period, the claimed browser displays its "load status" graphic *and* the Web page as it loads. Then it removes the "load status" graphic upon

completion of the 10-second content-loading process. This behavior informs the user, who otherwise is unsure if the slowly loading page has fully loaded, first that the content loading is proceeding and then that it has ended. And, it achieves this without taking up space on the display window's toolbar or taskbar, or obscuring the content after it has loaded. (A29 ('780 5:4-10).)

## B.     Claims 40-42 Require Displaying Content As It Loads.

The challenged independent claim 40 (A30-A31), distinctly claims this invention. It recites a device with a processor and a display, the display having a content viewing area. The device has a hypermedia browser configured to load content and display it in the content viewing area, the content being data from a source external to the browser (e.g., the Web). The browser also is configured to have two modes of operation, distinguished by the status of the content loading operation. During the first mode of operation, while the content is still loading, the hypermedia browser is configured to perform these three actions: (1) "loads content," (2) "displays such content in the content viewing area as it loads," and (3) "displays a 'load status' graphic element over" the content viewing area obstructing part of the displayed content, "wherein the presence of such

'load status' graphic element indicates that the browser is in the content-loading mode." During the second mode of operation, after the content loading is completed—which the claim calls the "content-loaded mode"— the browser (1) "displays loaded content in the content viewing area" but (2) "no 'load status' graphic element is displayed, wherein absence of such 'load status' element indicates that the browser is in the content-loaded mode." The full claim recites:

40. An information processing device comprising:

a processor;

a display;

a hypermedia browser executing on the processor to load and display content in a content viewing area on the display;

wherein the hypermedia browser is configured to operate in a content-loading mode and a content-loaded mode;

in the content-loaded mode, the hypermedia browser displays loaded content in the content viewing area and no "load status" graphic element is displayed, wherein absence of such "load status" graphic element indicates that the browser is in the content-loaded mode;

in the content-loading mode, the hypermedia browser loads content, displays such content in the content viewing area as it loads, and displays a "load status" graphic element over the content view area obstructing part of the content displayed in the content viewing area, wherein presence of such "load status" graphic element indicates that the browser is in the content-loading mode; and

wherein content comprises data for presentation which is from a source external to the browser.

9

(A30-A31.)

The two dependent claims recite presentation formats for the content. (A31 ('780 claims 41-42).)

## C. The Specification Describes Displaying Content As It Loads.

The specification also distinguishes the content-loading period from the subsequent content-loaded period. The content-loading period is when the content is still loading. The specification (written description and claims) makes this point repeatedly, both when discussing other browsers and when discussing the invention (emphases added):

(1)   "*during* times *when* the browser is loading content" (A23-A31 ('780 Abstract, 2:49-50, 4:55-56, 5:36-37));

(2)   "periods *when* content is being loaded" (*id.* ('780 2:6-7));

(3)   "*during* content loading" (*id.* ('780 2:9));

(4)   "*when* content is being loaded" (*id.* ('780 2:12));

(5)   "*when* the browser is loading content" (*id.* ('780 4:58));

(6)   "*during* periods of time when content is actually being loaded" (*id.* ('780 5:5-6));

(7)   "*during* the loading step" (*id.* ('780 5:21, 6:62));

(8)   "*while* loading" (*id.* ('780 7:58, 8:27)); and

10

(9)  "*as* it loads" (*id.* ('780 9:1)).

Thus, the specification uses "as," "when," "while," and "during" as synonyms to define this content-loading period of time during which both the loading content and the "load status" graphic element are displayed. In contrast, the specification uses different words with different meaning when referencing the later, content-loaded period of time:

(1)  "after the content is loaded" (A23-A31 ('780 Abstract));

(2)  "when the browser is not loading content" (*id.* ('780 4:59));

(3)  "after content has been loaded, during a period when no additional content is being loaded" (*id.* ('780 4:60-61));

(4)  "the current Internet page has been completely loaded" (*id.* ('780 4:62-63));

(5)  "when content is no longer being loaded" (*id.* ('780 5:22));

(6)  "when the browser's loading of content is complete" (*id.* ('780 5:51-52, 7:6-7));

(7)  "once the loading step is complete" (*id.* ('780 7:15-16)); and

(8)  "upon completion of the loading" (*id.* ('780 7:66)).

Thus, the specification clearly defines the content-loaded period as beginning *after* the content has completed loading. The content is still

11

displayed, of course, during the content-loaded period, but the "load status" graphic element is removed to inform the user that the content loading has completed.

### D. The Busy Clock Does Not Display Content As It Loads.

Motorola's reexamination request asserted only PenPoint's "busy clock" element as prior art against these three claims, unaccompanied by any background reference(s), or admitted art, or expert testimony. (A84-A85 (Proposed Rejection #2), A1341-A1342, A1427-A1431.) Its request cited two pages in each reference for the operation of this busy clock. (A451-A452, A762-A763.) Microsoft agrees that a skilled artisan would consult these four pages together to understand this busy clock element.

The busy clock was a standard tool the PenPoint environment provided for use by applications. (A451, A762.) Its mission was to reassure the user that her seemingly frozen, inoperative device was still working despite its display failing to respond immediately to the user's input or command:

> It is very important that the user have some indication that the machine is alive if the result of a command doesn't appear instantly. (A451.)

> Occasionally your application might need to perform some time-consuming work-time-consuming enough for the user to

12

notice that the machine is not responding. Such work might include performing compute-intensive work or copying large files across a network. To assure the user that the computer is still working, you can put up a busy clock, a small animated image of a clock face, on the screen. (A762.)

The PenPoint environment could automatically invoke this busy clock whenever any application took more than about a half second to respond to an input event, and then automatically remove it once the application was no longer too busy to respond:

> The PenPoint[tm] Application Framework ensures that all applications automatically bring up the busy clock if they take more than about half a second to respond to an input event, then automatically take down the busy clock when they are no longer busy. (A762.)

PenPoint also allowed programmers to program their application to send the PenPoint environment a message requesting display of the busy clock (when the application was too busy to respond to a user input) and then a second message to remove the busy clock when the application was no longer too busy to respond:

> Furthermore, you can control the busy clock programmatically by sending messages to theBusyManager. Messages for theBusyManager are defined in BUSY.H. (A762.)

Programmers were told to invoke the busy clock when the application would be too busy to "change the display for a number of seconds":

> When your application starts some work that will not change the display for a number of seconds, send msgBusyDisplay to theBusyManager with busyOn (a U32) as the argument. When your application is no longer busy, send msgBusyDisplay to theBusyManager with busyOff (a U32) as the argument. (A762.)

PenPoint warned programmers to use the busy clock consistently:

> PenPoint provides a standard busy clock for this purpose. It is very important to use the busy clock consistently, because your user will be expecting it, since it is used throughout the PenPoint environment. (A451.)

The pages Motorola cited illustrate the busy clock four times (A451-A452 (Figs. 45-48)); none showing the display of external content as it loads.

### E.    The Claimed Load-Status Element And The Prior Art Busy Clock Behave Differently To Convey Different Messages.

These two elements, the PenPoint busy clock and the claimed "load status" graphic, convey different messages to a user with their different behaviors. The prior art busy clock's message is that the apparently frozen computer actually is still working but is too busy doing something else to change the display in response to a user command. That is not the

14

message of the claimed "load status" indicator. Its message concerns a computer that does not appear frozen but instead is actively displaying content as it loads. The message is that this content is still loading.

The two elements convey their respective, different messages in part by the different times at which they appear and disappear. The busy clock appears when a short time passes without the display changing in response to a user input whereas the "load status" element instead appears when the computer is in the process of loading content and displaying content as it loads. The busy clock disappears when the display starts to update whereas the load status element instead disappears only after the content loading has completed.

The below table summarizes their different behaviors:

|  | Recited in Claims | Disclosed in PenPoint |
|---|---|---|
| Displays content while it loads | YES | no |
| Displays graphic while content loads | YES | no |
| Removes graphic once content fully loaded | YES | no |
| Displays graphic if too busy to change display | no | YES |
| Removes graphic once display starts to change | no | YES |

## F. An Expert Explained The Differences Between The Claimed Invention And The Prior Art Busy Clock.

Only Microsoft submitted expert testimony. (A1757-A1796.) Dr. Oded Gottesman, a Ph.D. computer engineer and scientist (A1758-A1759, A1790-A1794) compared claim 40 to PenPoint's busy clock and found these and other differences:

(1)    PenPoint does not teach displaying content as it loads (A1780, ¶ 116);

16

(2)    PenPoint's busy clock indicates whether the system is busy, not the status of content loading (A1779, ¶¶ 111-13; A1780, ¶¶ 118-19); and

(3)    In PenPoint, the disappearance of the busy clock does not indicate that the browser reached the content-loaded mode (A1779, ¶ 114).

Dr. Gottesman explained, without contradiction, that "it is my experience that browsers are typically not 'busy' and are able to receive interactive commands while loading content such as resizing or moving a browser window." (A1765, ¶ 35.) Therefore, he explained, content loading "is uncorrelated to the system busy state," and PenPoint's busy clock would not be displayed during content loading. (*Id.*) "Display of the busy clock when content is loading (as opposed to during a busy state) would be confusing to a user and would be contrary to the explicit purpose of the busy clock, which is to indicate to a user that the system is busy." (*Id.*)

Motorola submitted no contrary expert testimony or other contrary evidence.

## SUMMARY OF THE ARGUMENT

Motorola's appeal depends on rewriting the statute, to excise several requirements the Blue Br. disregards: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if ~~the differences between the subject matter sought to be patented and the prior art~~ are such that the ~~subject matter as a whole~~ would have been obvious at the time the invention was made ~~to a person having ordinary skill in the art to which said subject matter pertains~~." 35 U.S.C. § 103(a) (pre-AIA). By disregarding these requirements, the Blue Br. fails to make a *prima facie* showing of obviousness even under its proposed reworking of the claim and overhaul of the prior art. Specifically, the Blue Br. makes no argument and cites no evidence and no findings regarding the level of ordinary skill in the prior art, the differences between the claimed invention and the prior art, or the obviousness of the *combination* of elements recited in the claim as opposed to the obviousness of each individual claim element. To revoke an issued patent claim for supposed obviousness without careful analysis of these factual considerations would create a precedent devaluing all issued patents.

Motorola's appeal also depends on disregarding the plain meaning of "as," *viz.*, "when," "during," and "while," in the claim language "as it loads." Under this plain meaning of "as it loads," the Board's decision must be affirmed because PenPoint displayed the new content only *after* it completed loading. After is not during. The Court should reject Motorola's attempt to rewrite the claim to fit the prior art.

Motorola's appeal also depends on a fiction: that the Board interpreted the claim to preclude displaying all of the loaded content at the end of the content-loading mode. The Board did no such thing. Instead, it explained that displaying content only after it completes loading is not the same as displaying the content as it loads.

Motorola's appeal also depends on a major overhaul of the prior art busy clock that would defeat the mission of that element. As redesigned by Motorola, the busy clock would continue displaying when the system is *not busy*, but instead is loading content and displaying that content as it loads. This, of course, is the opposite of what PenPoint actually taught.

## ARGUMENT

**A.    The Judgment Should Be
Affirmed Because The Blue Br. Lacks
A *Prima Facie* Showing Of Obviousness.**

The Blue Br. has a cursory three-page discussion of obviousness which omits consideration of the skill in the art, differences from the prior art, and analysis of the claim as a whole. (Blue Br. at 34-36.) Motorola's shortcut is a dead end because each of these omitted elements is a statutory requirement of Section 103(a) (pre-AIA) of the Patent Act. Each guards against the lure of hindsight. By skipping these statutory elements, Motorola fails to make a *prima facie* showing of obviousness.

Section 103 of the Patent Act—which the Blue Br. does not cite—applies only when there are differences between the prior art and the claimed invention: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that . . . ." 35 U.S.C. § 103(a) (pre-AIA). The difference between the claimed invention and the prior art is one of the "basic factual inquiries" against which "the obviousness or nonobviousness of the subject matter is determined." *Graham v. John*

*Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). A challenger may be loath to concede that any difference exists, but concede it must to prove obviousness. Yet, the Blue Br. does not acknowledge or identify any differences between the asserted PenPoint references and the claimed invention. If Motorola thought that the busy clock anticipated the claims, then it should have preserved that ground. But it did not; instead asserting obviousness without bothering to conduct a real, statutorily compliant analysis of obviousness. That failure amounts to a failure to present a *prima facie* showing of obviousness.

Having failed to acknowledge any differences between the PenPoint busy clock and the claimed invention, the Blue Br. necessarily also fails to address any motivation to modify the busy clock to bridge such differences and arrive at the claimed combination, or a reasonable expectation of success if contemplating such modification. This too is a necessary requirement for a *prima facie* showing of obviousness. But, the words "expectation" and "motivation" do not appear in the Blue Br. Nor does the Blue Br. identify any market demands, teachings in background references, or expert testimony to support overhauling the busy clock to mimic the claimed invention.

The Blue Br. also does not discuss a person of ordinary skill in 1997, or the level of skill in the art in 1997. This too is a necessary, statutory requirement of an obviousness challenge: ". . . obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (pre-AIA).

The Blue Br. also does not discuss obviousness of the claim *as a whole*, namely the combination of elements recited in the claim. This too is a statutory requirement of an obviousness challenge: ". . . the subject matter as a whole would have been obvious at the time the invention was made . . . ." 35 U.S.C. § 103(a) (pre-AIA). Instead, its three-page obviousness analysis of claim 40 argues that PenPoint "renders obvious all of its limitations." (Blue Br. at 36.) But even if the asserted references did "teach" all of the individual limitations, which they do not, that would be insufficient to make a *prima facie* showing of obviousness of the claimed combination of elements.

Nor does Motorola cite findings by the Board filling these holes in its analysis.

By failing to address multiple elements necessary for a *prima facie* showing of obviousness, the Blue Br. fails to present a *prima facie* case.

And, of course, Motorola should not be permitted to belatedly address these disregarded elements in its Reply.

### B. The Judgment Should Be Affirmed Because "As" Means "While," Not "After."

The following proposition is self-evident, and dispositive: although displaying content while it loads leads to displaying all of the content when it completes loading, the converse is not true: displaying the content only after it finishes loading does not display it while it loads. The Board's decision should be affirmed because it correctly applied this logic after giving the claim term "as" (in "as it loads") its plain and broadest reasonable interpretation, of "while."

If someone asks their spouse to watch the stovetop "as I load the dishwasher," that does not mean wait until *after* the dishwasher is fully loaded to check if anything has boiled over. If someone is asked to "watch the children as I load the truck," that does not mean wait until *after* the truck is fully loaded to check on the children. What is true in the kitchen and in the driveway is true in this patent: "as" means "while," "during," or "when," not "after." Displaying content "as it loads" means displaying the content while it loads, during loading, when loading—as expressly disclosed in the patent—*not* waiting until after loading is completed. To

configure a browser to display the content of a Web page "as it loads" does not mean configure it to wait until *after* the content has fully loaded before displaying it.

Claim 40 requires that the browser be configured such that it "loads content, displays such content in the content viewing area as it loads, and . . . ." (A30-A31 ('780 8:67-9:1).) The plain meaning of "as" in "as it loads" is: "5. during or at the same time that: WHILE, WHEN …" (Webster's Third New International Dictionary Of the English Language, Unabridged (1993), p. 125). Thus, "as it loads" means that the content is being displayed while it is being loaded, i.e., at the same time it is loaded, i.e., during loading. It does not mean wait to display the content only after it has been completely loaded.

The inventors here did not give the word "as" a new meaning. Nothing in the patent redefines the word "as" or the phrase "as it loads." On the contrary, when referring to the content-loading period, the patent's specification uses the synonyms "while," "when," "during" and "as" the content loads. (*See supra* at 10-11.) And, as the Board explained (A8-A9), claim 40 expressly distinguishes "content loading" from "content loaded."

Indeed, claim 40 was carefully drafted to leave no doubt as to the distinction between these two time periods and modes of operation. First, the claim is directed to a device with a browser "configured to operate" in a specified manner, as opposed to a method. (A30 ('780 8:58).) A method might be performed by happenstance by a device configured to do something quite different, but these claims require the device to be configured to operate in specified modes, and that is not satisfied by mere happenstance. Second, the claim uses clear, self-explanatory descriptive labels to distinguish the two modes: "content-loaded" mode vs. "content-loading" mode. (*Id.* ('780 8:59).) Third, the claim specifies not only when the "load status" element appears (*viz.*, as the browser loads and displays the loading content) but also when it disappears (*viz.*, when the browser completes loading the content.) (*Id.* ('780 8:62, 9:1-4).) Fourth, the claim specifies what the "load status" element indicates to the user: "presence of such 'load status' graphic element indicates that the browser is in the content-loading mode." (*Id.* ('780 9:4-6).) This is a well-drafted claim that particularly points out and distinctly claims what the inventors regarded as their invention, leaving no doubt whatsoever that the content is displayed while it loads not merely after it has finished loading.

25

Motorola cites no evidence that "as" or "as it loads" is a special term of art having some unusual meaning in this art. Motorola identifies no special definition in the patent of the term "as" or "as it loads." Motorola does not deny that the specification defines the content-loading period as the period "while," "when," "during," and "as" the content loads—as quoted *supra* at 10-11. Motorola does not argue for some clear disclaimer of subject matter in the patent.

The only claim-construction principle Motorola cites is that a claim generally should not be construed to exclude the only disclosed embodiment. (Blue Br. at 29-30.) But that has no bearing here. As noted, the patent specification repeatedly defines the content-loading period (during which the loading content is displayed) as "*during* times when the browser is loading content" (A27 ('780 2:49-50, 5:36-37)), "*when* the browser is loading content" (*id.* ('780 4:58)), "*during* periods of time when content is actually being loaded" (*id.* ('780 5:5-6)), "*during* the loading step" (*id.* ('780 5:21, 6:62)), and "*while* loading" (*id.* ('780 7:58, 8:27)). Thus, the Board's interpretation of "as it loads" to mean while the content loads, comports with the disclosed invention.

The patent's drawings do not change the disclosed invention. Drawings in patents do not stand alone; they are accompanied by a textual description of what is shown. Here, for instance, the content displayed in Fig. 3 of the patent (A25) looks the same as the content displayed in Fig. 4 (A26). But, it is not the same, as the patent explains. The patent explains that the browser of Fig. 3 "is loading content," unlike Fig. 4 in which "the current Internet page has been completely loaded." (A28 ('780 4:53-63).) Motorola cites but disregards this explanation in the patent and asks the Court to look at "the plain teaching of" Fig. 3 in isolation and declare that it shows all of the content having been loaded. (Blue Br. at 11, 22, 27, 30, 33.) But, Motorola cites no evidence demonstrating that a person of skill in the art would have dismissed the patent's own description of Fig. 3. Nothing suggests that the skilled artisan would have looked at the drawings alone and not read their accompanying descriptions. For that and other reasons, Motorola's citation to Fig. 3 fails to establish any clear disavowal of the plain meaning of "as it loads."

27

### C.    The Judgment Should Be Affirmed Because The Appeal Rests Upon A Fictional Claim Construction The Board Did Not Adopt.

Motorola's central thrust attacks a fictional construction. Motorola states that the "Board's construction excludes displaying all loaded content while in content-loading mode" (Blue Br. at 5), "the Board limited the claim to exclude displaying all loaded content during 'content-loading mode'" (*id*. at 28), and that the Board's construction requires that some of the loaded content "is withheld from 'content-loading mode' and only displayed during the 'content-loaded mode'" (*id*. at 21). But, the Board did nothing of the kind and Microsoft urged nothing of the kind. That would be a rather dumb idea, to show most of the content as it loads but not display the very last content to load.

Obviously, someone watching the stove top as the dishes are being loaded in the dishwasher likely still will be watching the stove top the instant the last dish enters the dishwasher. Similarly, the claim's requirement that the content be displayed as it loads does not prohibit continuing to display the content the instant it completes loading. But that does not help Motorola prove the converse that it must prove to prevail. Specifically, it does not show that being configured to display the

content only after it has fully loaded is the same as being configured to display the content as it loads.

The Board did not rule that the claimed invention requires the browser to stop displaying the content shortly before it completes loading the content. Instead, the Board ruled that displaying the content *only after it loads* fails to display the content *as it loads*. (A8-A9.) Returning to our 10-second-download example, a browser that displays the Web page throughout those ten seconds as it slowly displays on the screen falls within this claim element. That is true even if it continues to display the content after it is fully loaded. But, one that has a blank screen for 10 seconds and only then flashes the fully loaded page on the screen, does not. This is akin to the difference of having the curtain up as the stagehands change scenery between acts versus changing scenery with the curtain down and raising the curtain only after the new scenery is fully loaded onto the stage. The claimed invention requires the former; the busy clock does the latter.

Neither Microsoft, nor the Examiner, nor the Board suggested that the claimed content-loading mode forbids continuing to display the

loading content as it completed loading. As Motorola's appeal depends on this fictitious claim interpretation, the judgment should be affirmed.

### D. The Judgment Should Be Affirmed Because PenPoint Did Not Render The Claimed Combination Obvious.

It was, of course, Motorola's burden to prove obviousness. It did not.

What the cited PenPoint pages taught is clear. If a computer display is too busy to immediately update its screen display in response to a user's input, then an animated busy clock will be displayed to reassure the user that the computer is still working. (A451-A452, A762-A763.) Once the computer display starts to change, however, showing the user that the computer is working, the busy clock is removed. (A762.) This busy clock prior art does not disclose displaying external content as it loads, or displaying the busy clock as the display is changing with new external content.

Motorola's reexamination request did not assert or show that PenPoint discloses displaying the Web page before it completed loading. On the contrary, Motorola conceded that PenPoint discloses displaying the content *after* it loads: "PenPoint teaches that content, including text and hyperlink buttons, is displayed in a content viewing area (e.g., Work

Area) in the Notebook interface after it loads. (*See* PenPoint UI Guidelines at 22-23, 180-182.)" (A3855.) Motorola also did not contest Dr. Gottesman's explanation of why PenPoint's busy clock would not be displayed during content loading. (A1765, ¶ 35.) And, Motorola has not challenged the factual aspect of the Board's finding that the content in PenPoint "is not displayed as it loads, but rather after it loads." (A8.)

Thus, the Board's decision should be affirmed because (1) the claim requires display of the content as it loads, not merely after it has completed loading, (2) PenPoint displays the content only after it loads, not while it loads, and (3) there is no evidence or finding that a skilled artisan would have changed this behavior of the busy clock to mimic that of the claimed invention.

## CONCLUSION

Motorola presents a superficial obviousness analysis which omits three statutory requirements, changes the meaning of "as" from "while" to "after," attacks a fictional claim construction, and overhauls the prior art busy clock so dramatically that it no longer serves its sole purpose. And, it presents no expert testimony, no background art, and no evidentiary rebuttal to the expert testimony submitted by Microsoft.

For all these reasons, the Court should affirm the judgment and award

costs to Microsoft.

Respectfully submitted.

/s/Joseph T. Jakubek
Joseph T. Jakubek
Todd M. Siegel
John D. Vandenberg
KLARQUIST SPARKMAN, LLP
One World Trade Center
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204-2988
(503) 595-5300
joseph.jakubek@klarquist.com
todd.siegel@klarquist.com
john.vandenberg@klarquist.com

*Counsel for Appellee*
*Microsoft Corporation*

January 12, 2016

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## *MOTOROLA MOBILITY LLC v. MICROSOFT CORP.*, No. 15-2061

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to the law and being over the age of 18, upon my oath depose and say:

Counsel Press was retained by KLARQUIST SPARKMAN, LLP Counsel for Defendant-Appellee Microsoft Corporation to print this document. I am an employee of Counsel Press.

On January 12, 2016, counsel authorized me to electronically file the foregoing **Opening Brief of Defendant-Appellee Microsoft Corporation** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

> Debra J. McComas
> Andrew S. Ehmke
> Michael S. Parsons
> HAYNES AND BOONE, LLP
> 2323 Victory Avenue, Suite 700
> Dallas, Texas 75219
> Telephone: 214.651.5375
> Facsimile: 214.200.0525
> Debbie.McComas@haynesboone.com
> Andy.Ehmke@haynesboone.com
> Michael.Parsons@haynesboone.com
> *Attorneys For Appellants,*
> *Motorola Mobility LLC and Google Inc.*

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Additionally, 6 paper copies will be filed with the Court within the time provided in the Court's rules.

DATE: January 12, 2016          /s/ Robyn Cocho
                                Robyn Cocho
                                Counsel Press

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## *MOTOROLA MOBILITY LLC v. MICROSOFT CORP.*
## No. 15-2061

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

   • The brief contains 5,990 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

2.    This brief complies with the or typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   • The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Century Schoolbook font.

January 12, 2016                          /s/Joseph T. Jakubek
                                          Signature of counsel

                                          Joseph T. Jakubek
                                          Printed name of counsel